(103 App. Div. 472.)

INSURANCE PRESS v. MONTAUK FIRE DETECTING WIRE CO. et al.

(Supreme Court, Appellate Division, First Department. April 14, 1905.)

CORPORATIONS—STOCK—ISSUANCE FOR LESS THAN PAR—REMEDY OF MINORITY STOCKHOLDERS—RESCISSION.

Where directors of a corporation which had issued none of its stock entered into a contract with the corporation, whereby all the stock, of the par value of $3,000,000, was issued to them in consideration of a transfer by them to the corporation of patent rights worth but $10,000, in violation of the law of the state in which the corporation was created, which prohibited the issual of stock for less than par, and afterwards retransferred a part of the stock to the corporation to be sold to raise working capital, a purchaser of the stock so retransferred could not, in his capacity as minority stockholder, maintain an action to compel the directors to retransfer to the corporation any part of the stock which they had received from the corporation as consideration for the sale of the patents, without offering to rescind the sale, and to retransfer to the directors the patents constituting the subject of such sale.

Appeal from Special Term, New York County.

Action by the Insurance Press against the Montauk Fire Detecting Wire Company and others. From an interlocutory judgment sustaining a demurrer to the complaint, plaintiff appeals. Affirmed.

Argued before VAN BRUNT, P. J., and McLAUGHLIN, PATTERSON, INGRAHAM, and LAUGHLIN, JJ.

A. Walker Otis, for appellant.

Irving L. Ernst, for respondents.

INGRAHAM, J.  The plaintiff brings this action as a stockholder of the defendant corporation to enforce a claim of that corporation against the individual defendants.  The complaint alleges that the defendant corporation was organized under the laws of the state of West Virginia, that the defendant Gould is its president, and the defendant Hanson its treasurer; that the defendant corporation was originally organized in May, 1897, with a capital stock of $100,000, which was in the month of May, 1897, increased to the sum of $3,000,-000, divided into 300,000 shares, of the par value of $10 per share; that at the time of the organization of the company the defendants Gould and Hanson owned or controlled certain patents relating to the detecting of fire by means of a certain arrangement of wires, "the value of which patents did not, to the knowledge of said John D. Gould and Charles A. Hanson, exceed in value the sum of $10,000"; that in the month of May, 1897, the defendants Gould and Hanson, being directors of the said corporation, "with the intent to deprive said company of its right to obtain money or property by the insurance of said capital stock to bona fide subscribers at par, and with the intent to acquire said capital stock for their own use by paying therefor less than 1 per cent. of its par value, entered into an agreement with the other directors of said company whereby said John D. Gould and Charles A. Hanson caused to be assigned to said Montauk Fire Detecting Wire Company the patents aforesaid, well knowing same to be worth not exceeding $10,000, and thereupon, without any further consideration passing to said company, the directors of the latter caused to be issued to said John D. Gould and Charles A. Hanson the entire capital stock of said Montauk Fire Detecting Wire Company in the proportion of $2,000,000 to said John D. Gould and $1,000,000 to said John A. Hanson"; that subsequently Gould transferred to said company $500,-000 of the stock so issued to him as aforesaid, and said Charles A. Hanson immediately transferred to said company $250,000 of the stock so issued to him as aforesaid, the said aggregate of $750,000 being entered on the books of said company as treasury stock; that subsequently Gould sold of the said stock so issued to him stock of the par value of $423,980, for which he has received more than $10,000 in cash, and said Gould now holds the sum of about $1,076,020 of said stock for which the defendant has not paid or said corporation received any value whatever; that the defendant Hanson has transferred stock of the company received by him in a sum exceeding $10,000, and has subsequently acquired additional stock, so that he now holds about $816,310 of said stock, of which $750,000 represented the original issue so received by him; that at the time of the organization of the defendant corporation and the issuance of its capital stock to the defendants Gould and Hanson in May, 1897, as aforesaid, the statute law of the state of West Virginia provided "that in no case should the stock of a corporation organized under the laws of the state of West Virginia, except a mining or railroad corporation, be sold or disposed of by the corporation at less than par"; that subsequent to May 1, 1900, the

plaintiff, being ignorant of the acts of the defendants Gould and Hanson heretofore alleged, and believing that all the capital stock of said corporation was full paid, and had been issued for full value, purchased from the said corporation 400 shares of its capital stock, paying therefor the sum of $2,000, for which plaintiff received certificates of stock, which on their face purported to be full paid; that the defendant corporation is now under the control of said Gould and Hanson, "and for that reason it is impracticable that said company should bring this action against them." And the complaint demands judgment that the stock, amounting to $1,076,020, now held by the defendant Gould as aforesaid, be declared illegal and void because of the fraudulent acts alleged, and that he be directed to deliver the same to the defendant corporation; and that of the stock held by the defendant Hanson the sum of $750,-000 be declared illegal and void because of the fraudulent acts hereinbefore alleged, and he be directed to deliver the same to the corporation for cancellation.

Although the allegation as to the value of these patents at the time they were assigned to the defendant corporation and the stock issued therefor is subject to criticism in that the complaint does not directly allege that the value of these patents did not exceed the sum of $10,000, the allegation being that it did not, to the knowledge of Gould and Hanson, exceed that sum; and a further allegation that Gould and Hanson caused to be assigned to the wire company the patents aforesaid, they knowing the same to be worth not exceeding $10,000, is only an allegation as to Gould's and Hanson's knowledge, and not of the fact—still in disposing of this case we may assume that the pleader intended to allege that the patents were worth a sum not to exceed $10,000, and that the defendants Gould and Hanson had knowledge of such value.

Upon a former appeal to this court from a judgment sustaining a demurrer to a complaint which did not allege that the issue of this stock was illegal by the laws of the state of West Virginia, under which this corporation was organized, it was held that there was no cause of action. 83 App. Div. 259, 82 N. Y. Supp. 104. In the complaint in this action it is alleged that the statute law of the state of West Virginia provides that in no case should the stock of a corporation organized under the laws of that state, except a mining or railroad corporation, be sold or disposed of by the corporation at less than par. We have, therefore, a case in which a corporation organized under the laws of a state which provide that its stock shall not be sold or disposed of by the corporation at less than par has issued its stock of the par value of $3,000,000 for the purchase of property worth $10,000. The question is, what remedy has the corporation against the persons to whom the stock was issued in the purchase of property, the value of which was much less than the par value of the stock issued? The complaint alleges that the corporation has received a transfer of the patents, and that for the patents the corporation has issued its stock in an amount that was agreed upon as between the owners of the patents and the corporation as the consideration for the transfer. I suppose that there is no species of property the value of which is more uncertain than

letters patent which secure to the patentee the exclusive right to manufacture the patented article. From the nature of the property, the real value of patents can only be determined after the invention is introduced and in use. Owning property of this description, the individual defendants and the directors of the company made an agreement as to its value, and for that value the patents were transferred to the company, and the individual defendants received the agreed compensation. Considering the relations that existed between this company and the defendants, such gross overvaluation would undoubtedly give to the corporation a right to disaffirm that contract, and would also give to any stockholder, if any were in existence before the stock was issued, a right to apply to a court of equity to prevent the consummation of such a transaction. The complaint, however, alleges that all of the stock of the corporation was issued to the individual defendants for the patents. This transaction did not change the substantial position of the parties. Before the transaction a corporation was organized, but none of its stock was issued, and it had no property, and the individual defendants had the patents. After the transaction, the company had the patents and the individual defendants had all of its stock. The substantial position then was that the individual defendants, owning all of the stock of the company which owned the patents, and nothing else, really owned the patents. The individual defendants then transferred back to the company a certain amount of stock which was to become the property of the company, and to be disposed of by it for its own benefit. Such a condition is not unusual in companies of this character. In order to make its stock of any value, it was essential that the company should have a working capital in addition to the patents; and the persons who had exchanged their patents for the stock of the company were willing to give to the company a portion of the stock, so that the working capital could be secured, and thus give value to the remainder of the stock. The plaintiff had purchased from the company a portion of this stock thus transferred by the individual defendants to the company, and for that stock it has paid to the company 50 per cent. of its par value. When it purchased this stock it must have understood that it was stock that had been acquired by the company, and not an original subscription for the stock. For the corporation to issue its stock for 50 per cent. of its par value would have been as illegal as the transaction of which the plaintiff complains. As before stated, the company has power to rescind the transactions, and upon a tender of a transfer of the patents the individual defendants could be compelled to retransfer their stock to the defendant corporation, or to account to the corporation for the stock that they were unable to so transfer if there were fraud in the transaction; but this neither the plaintiff, as stockholder, nor the corporation, proposed to do. They proposed to hold on to the property that they had acquired from the individual defendants, but to compel the individual defendants to return to the corporation a part of the consideration that the corporation had paid for the patents. The effect of this would be to compel the individual defendants to

sell to the corporation the patents for a sum which the court should find the patents were worth at the time of the transfer. The individual defendants were the owners of these patents. They had the right to hold them, unless they obtained the price at which they were willing to sell, and were not bound to sell them at a price to be fixed by the plaintiff, by the court, or by anybody else. Whether they knew that the value of the patents did or did not exceed $10,000 was entirely immaterial. They had a right to hold the letters patent until they were offered the price at which they were willing to sell. They sold them to this company for its whole capital stock, agreeing with the company that that was the value of the patents. I know of no principle which would justify a court of equity in compelling the owners of these patents to accept any consideration for their transfer to the corporation except that agreed on, and, upon the ground that the patents are not worth the sum agreed on as a consideration for the transfer, decree that the vendors must pay back to the company the consideration they had received, less the real value. The company cannot keep the patents unless it is willing to pay what the owners of them were willing to sell them for. It is not pleaded that West Virginia has provided a penalty for a violation of its law, or has imposed upon the purchasers of stock from the company at less than its par value in cash or property any liability to the company for the stock beyond that which they transferred to the company for it. The mere fact, therefore, that stock was issued in violation of this provision of the law of the state of West Virginia, would give the corporation no right, except possibly a right to rescind the transaction and recover back its stock upon a retransfer of the patents.

It is alleged that these defendants were at the time of the transaction directors of the company, and that the other directors made the agreement between the individual defendants and the company by which the patents were transferred to the company and the stock was issued. It is not alleged that there was any fraud in this transaction, except that it may be implied from the relations of the purchasers to the corporation and the overvaluation. No false representations are alleged, nor is it alleged that these individual defendants acted in relation to the transaction except as persons having property which the corporation desired, and which they were willing to sell at a price agreed to between them and the corporation as the value of the property. Does the fact that these defendants occupied the relation that they did to the corporation give to the corporation any other right than to rescind the transaction? As before stated, the transaction as between the corporation and these individual defendants did not substantially change the existing situation. Upon the issue and transfer of the stock the individual defendants still owned all of the patents, and really nothing else, for all of the property of the company was patents, and the individual defendants owned all of the capital stock. The individual defendants transferred to the company, without consideration, a portion of the stock that they had acquired for the sale of the patents; and while that stock still belonged to the company the substantial condition remained the same. The individual defendants owned all of the outstanding

stock, and the company owned the patents, and nothing more.   The company then sold to the plaintiff some of the stock that it had acquired from the individual defendants.   The complaint does not allege that any false representations were made to induce it to purchase this stock.   It alleges that the plaintiff purchased the stock assuming that it had been issued for full value, as required by the laws of the state of West Virginia.   We are not now concerned with any cause of action that might exist as between the plaintiff and the corporation to rescind that sale.   I do not know that this question has been presented in any case in this state. . The courts in England, however, have expressly held that the remedy of a corporation that had been induced to purchase property from its directors or officers is to rescind the sale, and to recover back the consideration.   Thus, in Erlanger v. New Sombrero Phosphate Co., 3 App. Cas. 1218, the action was to rescind a contract of sale made by promoters to the corporation, and it was expressly held that an application to compel the promoters to account for the profits that they had made by the sale to the company could not be granted; that all the relief that a court of equity could grant was a rescission of the sale.   In Burland v. Earle, App. Cas. 1902, p. 83, the privy council held that the sole relief that a corporation which has purchased property from one of the directors of the company at a price largely in excess of that which the director had paid for it was to rescind the sale, and that the corporation could not, by an action in equity, compel the director to account for the difference between what he had paid for the property and the price at which he had sold it to the corporation.   Lord Davey, in disposing of that case, said:

"Both courts have held that the resale was by Burland's advice and influence, and was made without disclosing to the company the price at which he had purchased.   It was also held in the Court of Appeal that Burland had bought the property with the intention and for the purpose of reselling it to the company. * * * But their lordships do not think it necessary to pursue these topics, because they are of opinion that the relief prayed by the amended statement of claim and granted in the courts below is altogether misconceived.   There is no evidence whatever of any commission or mandate to Burland to purchase on behalf of the company, or that he was in any sense a trustee for the company of the purchased property. * * * Let it be assumed that the company or the dissentient shareholders might by appropriate proceedings have at one time obtained a decree for rescission of the contract.   But that is not the relief which they ask, or could, in the circumstances, obtain, in this suit."

In Hutchinson v. Simpson, 92 App. Div. 382, 87 N. Y. Supp. 369, there is a very full discussion of the relation between a corporation and those from whom it receives a transfer of property upon its organization by an issue of stock; and, while the facts are somewhat different from the facts disclosed by the complaint in this action, the general principle upon which that case was decided prevents the corporation from obtaining the relief asked for in this action.   Mr. Justice Hatch, in his dissenting opinion, thus speaks of the relation that exists between a purchaser of property from a corporation and the corporation, where the property purchased is paid for by the issue of all the stock of the corporation:

"In Parsons v. Hayes, 50 N. Y. Super. Ct. 29, the transfer was of property to the corporation.   The stock was issued by it for the property which it ob-

tained at a gross overvaluation, but the only persons interested therein at that time were the persons who owned the property, who transferred it to the corporation, and who received all of its stock. While occupying that relation, neither the company nor any one connected with it could by any possibility be damaged or deceived. The transaction enabled the owners of the property to place such value upon it as they chose, and represent it to be of that value in stock, which was issued. The company, by this arrangement, could not be damaged, nor could the individuals whose active efforts created the relation, and who were the owners of the entire stock issue. If anybody could be deceived, they were the subsequent purchasers of the stock, who might pay for it upon the supposition that the property which it represented was worth the value of the stock issued. Very likely such condition operated as a misrepresentation of the value of the stock, and might result in perpetrating a fraud upon vendees, but it did not damage the company, nor did the transaction give any right of action in its favor against any one."

It seems to me, therefore, that the plaintiff, a minority stockholder, could not maintain an action to compel the owners of property that had been conveyed to the corporation to pay back to the corporation any portion of the consideration that had been paid for such property, without a rescission of the sale and a retransfer to the vendors of the property which had been transferred to the corporation, and for which the vendors had received the consideration agreed upon.

It follows that the judgment appealed from must be affirmed, with costs. All concur.