## UNITED STATES v. CHEMICAL FOUNDATION, Inc.

(District Court, D. Delaware. January 3, 1924.)

No. 502.

1. War ⚮12—Enemy property not condemned without act of Congress.

Enemy property found on land in the United States cannot be condemned as enemy property without an act of Congress, and a declaration of war is not such an act.

2. War ⚮12—Enemy property may be sold for less than its fair monetary value in public interest.

Under Trading with the Enemy Act, § 12, par. 4, as amended by Act March 28, 1918, § 1 (Comp. St. 1918, Comp. St. Ann. Supp. 1919, § 3115½ff), Alien Property Custodian could sell letters patent, copyrights, and trade-marks appertaining to chemicals and pharmaceuticals at private sale under conditions partially destructive of the selling value, even to American citizens, where considered by the President for the public interest; such act being strictly a war measure, finding its sanction in Const. art. 1, § 8, cl. 11.

3. Trusts ⚮171—Powers of trustee depend on nature of trust and terms of instrument creating it.

The powers of a trustee over the trust property depend on the nature of the trust and the terms of the instrument by which it is created.

4. War ⚮12—No restrictions on power of Congress to confiscate enemy-owned property.

There are no restrictions on the war power of Congress to confiscate enemy-owned property, the extent to which that right shall be exercised during any particular war being a matter of policy, to be determined solely by it; and the Trading With the Enemy Act (Comp. St. 1918, Comp. St. Ann. Supp. 1919, § 3115½a et seq.) permitting sale of enemy property for less than its value, where public interest so demands, is not in conflict with rules of international law.

5. Constitutional law ⚮70(3)—Courts may only inquire whether act within scope of constitutional power.

Courts may inquire whether act passed by Congress is within the scope of its constitutional power, but beyond this they may not go, and may not consider the wisdom of the act.

6. Constitutional law ⚮70(1)—Not judicial function to make law.

The judicial function is to give effect to the law as it is, and not to make the law.

7. War ⚮12—Courts without jurisdiction in matter of indemnity.

In the matter of indemnity for property of enemy confiscated in time of war, the courts are without jurisdiction.

8. War ⚮34—All claims of Germany and nationals to property barred by treaty.

By the Treaty of Versailles all claims of Germany and Germany's nationals to property seized by the Alien Property Custodian and sold are barred.

**9. Constitutional law ⟨⟩62—War ⟨⟩4—Trading with Enemy Act does not delegate legislative power.**

Trading with the Enemy Act, § 7c, as amended by Act Nov. 4, 1918, § 1 (Comp. St. Ann. Supp. 1919, § 3115½d), and section 12, as amended by Act March 28, 1918, § 1 (Comp. St. 1918, Comp. St. Ann. Supp. 1919, § 3115½ff), is not unconstitutional, as delegating legislative power; the statute merely placing on the President the duty of dividing the enemy property into classes specified therein.

**10. Constitutional law ⟨⟩319—Trading with the Enemy Act not in conflict with Fifth Amendment to Constitution.**

Trading with the Enemy Act, § 12, as amended by Act March 28, 1918, § 1 (Comp. St. 1918, Comp. St. Ann. Supp. 1919, § 3115½ff), is not in conflict with the Fifth Amendment to the Constitution, in that it would permit the confiscation of property of American citizens resident within the territory of any nation with which the United States is at war, "enemies" by virtue of section 2 of the act (Comp. St. 1918, Comp. St. Ann. Supp. 1919, § 3115½aa).

**11. War ⟨⟩12—Remedy for seizure of property by Alien Property Custodian held to apply only to property mistakenly seized.**

Trading with the Enemy Act, § 7 (c), as amended by Act Nov. 4, 1918, § 1 (Comp. St. Ann. Supp. 1919, § 3115½d), relating to remedies where Alien Property Custodian seizes property, applies only to citizens, allies, and neutrals whose property has been mistakenly seized, or seized and sold, and does not apply to "enemies or allies of enemies."

**12. Constitutional law ⟨⟩67—What constitutes just compensation for property seized by government is judicial question.**

Determination of what constitutes just compensation for property seized by the government is a judicial, and not an executive or congressional, function.

**13. Constitutional law ⟨⟩46(1)—Constitutionality of statute not determined merely in the interest of persons whose rights are not affected.**

In a suit by the United States to annul sales of property made by the Alien Property Custodian during the war, where the property sold was actually the property of enemy aliens, a contention that, to construe Trading with the Enemy Act, § 12, as amended by Act March 28, 1918, § 1 (Comp. St. 1918, Comp. St. Ann. Supp. 1919, § 3115½ff), as permitting a sale of enemy property for less than its value in the interests of the public, would bring into conflict with the Fifth Amendment to the Constitution that portion of the amendment by Act Nov. 4, 1918, § 1, to section 7 (c), being Comp. St. Ann. Supp. 1919, § 3115½d, relating to remedies where property mistakenly seized, need not be considered, in that no property of American citizens, allies, or neutrals is involved.

**14. War ⟨⟩12—Statute concerning disposition of enemy property after war inapplicable to disposition during war.**

Trading with the Enemy Act, § 12, par. 6 (Comp. St. 1918, Comp. St. Ann. Supp. 1919, § 3115½ff), providing that, after the end of the war, any claim of an enemy or ally of an enemy to any money or other property received and held by the Alien Property Custodian, or deposited in the United States treasury, shall be settled as Congress shall direct, did not control or prescribe the powers of disposition of enemy property during the war, or the terms and conditions of such disposal.

**15. United States ⟨⟩31—Solicitor of Department of State an officer.**

The Solicitor of the Department of State is an officer of the United States.

**16. War ⟨⟩12—Power to sell enemy property in other than mode prescribed need not be exercised by President in person.**

The power given by Trading with the Enemy Act, § 12, as amended by Act March 28, 1918, § 1 (Comp. St. 1918, Comp. St. Ann. Supp. 1919, § 3115½ff), to sell enemy property by a method otherwise than as pro-

⟨⟩For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

vided therein, where public interest requires, need, not be exercised by the President in person, but could properly be delegated by the President to the Alien Enemy Property Custodian.

17. Evidence ⊜⇒83(I)—Presumed that public officer acts rightly.

There is a presumption of law that every public officer acts rightly; the maxim being, "Omnia præsumuntur rite esse acta."

18. Officers ⊜⇒110—That construction which vitalizes an official order preferred to that which strikes it down.

That construction which sustains and vitalizes an instrument such as an official order should be preferred to that which strikes down and paralyzes it.

19. War ⊜⇒12—Order conferring powers on Alien Property Custodian held not invalid.

The order of the President of December 3, 1918, vesting in Frank L. Polk all power and authority conferred upon the President by the provisions of Trading with the Enemy Act, § 12, as amended by Act March 28, 1918, § 1 (Comp. St. 1918, Comp. St. Ann. Supp. 1919, § 3115½ff), was not invalid as conferring the power on the latter in his personal capacity; Mr. Polk being in fact Solicitor of the Department of State, and as such an officer of the United States.

20. War ⊜⇒12—Sale of enemy property held not invalid, as granting of subsidy to private industry.

Sale by the Alien Property Custodian to the Chemical Foundation of property consisting of letters patent, copyrights, and trade-marks pertaining to chemicals and pharmaceuticals for less than their value to their enemy owners, under Trading with the Enemy Act, § 12, as amended by Act March 28, 1918, § 1 (Comp. St. 1918, Comp. St. Ann. Supp. 1919, § 3115½ff), was not invalid as being in legal effect the granting of a subsidy to private industry; it appearing that the sale was made in the public interest.

21. Constitutional law ⊜⇒74—Acts of officers within scope of their powers in selling enemy property not subject to judicial nullification or review.

If the executive officers on whom Congress conferred power of disposal of enemy property under Trading with the Enemy Act, § 12, as amended by Act March 28, 1918, § 1 (Comp. St. 1918, Comp. St. Ann. Supp. 1919, § 3115½ff), acted within the scope of their powers in selling property for less than its value for the public interest, their acts are not subject to judicial nullification or review, though the terms and conditions thereof were otherwise than in the judgment of the court they should have been.

22. Constitutional law ⊜⇒74—Statement of reasons actuating President in selling enemy property does not make act less than act of discretion.

Statement of reasons actuating the President in permitting or ordering sale of enemy property for less than its value in the public interest under Trading with the Enemy Act, § 12, as amended by Act March 28, 1918, § 1 (Comp. St. 1918, Comp. St. Ann. Supp. 1919, § 3115½ff), does not make his act any the less an act of discretion, especially as the judicial power to determine whether the reasons assigned are supported by the facts extends to any and all reasons or to none.

23. War ⊜⇒12—Sale of enemy property held not shown induced by combination and conspiracy.

Sale by the Alien Property Custodian to the Chemical Foundation of letters patent, copyrights, and trade-marks pertaining to chemicals and pharmaceuticals, under Trading with the Enemy Act, § 12, as amended by Act March 28, 1918, § 1 (Comp. St. 1918, Comp. St. Ann. Supp. 1919, § 3115½ff), under conditions of sale partially destructive of the selling value even to American citizens, held not shown to have been induced, brought about, and accomplished by and through a combination, scheme, and conspiracy of representatives of the chemical and dye industries.

⊜⇒For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

24. War ⬧12—Alien Property Custodian could assign patents to corporation of which president.

Assignments of patents, copyrights, and trade-marks pertaining to chemicals and pharmaceuticals by the Alien Property Custodian to the Chemical Foundation, of which he was president, were not invalid, under Criminal Code, § 41 (Comp. St. § 10205), in view of Trading with the Enemy Act, § 7 (e), being Comp. St. 1918, Comp. St. Ann. Supp. 1919, § 3115½d.

In Equity. Suit by the United States against the Chemical Foundation, Incorporated. Bill dismissed.

Harry M. Daugherty, Atty. Gen., James H. Hughes, Jr., U. S. Atty., of Wilmington, Del., and Henry W. Anderson and Herman J. Galloway, Sp. Asst. Attys. Gen. (H. E. Knight, of Washington, D. C., Spier Whitaker, of New York City, James J. Lenihan, of Washington, D. C., William M. Offley, of New York City, and Thomas E. Rhodes and William W. Wilson, both of Washington, D. C., of counsel), for the United States.

William D. Guthrie, Isidor J. Kresel, and Bernard Hershkopf (of Guthrie, Jerome, Rand & Kresel), all of New York City, Lucien H. Boggs and Sciforde M. Stellwagen, both of Washington, D. C., and William G. Mahaffy, of Wilmington, Del., for defendant.

MORRIS, District Judge. By this suit in equity instituted by the United States of America against the Chemical Foundation, Incorporated, the plaintiff seeks the annulment of sales of property purporting to have been made by the plaintiff to the defendant. The property sold consisted mainly of United States letters patent, copyrights and trade-marks pertaining to chemicals and pharmaceuticals. At the outbreak of the war it was owned by subjects of Germany. During the war it was seized as enemy property by the Alien Property Custodian. The President, stating the reasons therefor in the public interest, authorized the Custodian to sell the same to the defendant at private sale upon such terms and conditions as to the Custodian might seem proper. The sales were made in the years 1919, 1920 and 1921. Conditions of sale were that the property should be held in a fiduciary capacity for the Americanization of such industries as might be affected thereby and for the advancement of chemical and allied science and industry in the United States; that nonexclusive licenses, only, should be granted; that the United States should receive free licenses; and that other licenses granted should be upon reasonable and equal terms without advantage as between licensees. The monetary consideration paid was approximately $271,000.

The plaintiff challenges the power to make the sale. It asserts, and the fact is not disputed, that the price for which the property was sold was far less than the property was worth to the Germans from whom it was seized. It asserts that the conditions of sale were partially destructive of the selling value even to American citizens. This is likewise conceded. It contends that no authority existed for selling enemy property for less than its fair monetary value and that conditions of sale destructive of its fair monetary value, though in the public interest and even though the independence of the United

States might have depended thereon, could not be imposed. The defendant takes the position that in the disposition of enemy property there was not only a power, but also a primary duty, to consider and safeguard the public interest; that the President and the Custodian were clothed with this power and burdened with this duty, and that, in the absence of fraud, their acts done in the exercise of this power and in the performance of this duty are not subject to judicial review. There is thus presented the broad question of power with respect to the seizure and sale of enemy property.

[1] Enemy property found upon land in the United States cannot be condemned as enemy property without an act of Congress. A declaration of war is not such an act. Brown v. United States, 8 Cranch, 110, 3 L. Ed. 504. The Trading with the Enemy Act (40 Stat. 411 [Comp. St. 1918, Comp. St. Ann. Supp. 1919, § 3115½a et seq.]), approved October 6, 1917, as amended in March and November, 1918 (40 Stat. 460 and 1020), is here relied on. Whether considered as originally passed or as amended that act is strictly a war measure finding its sanction in the constitutional provision (article 1, § 8, cl. 11), empowering the Congress "to declare war, grant letters of marque and reprisal, and make rules concerning captures on land and water." Stoehr v. Wallace, 255 U. S. 239, 241, 242, 41 Sup. Ct. 293, 295 (65 L. Ed. 604); Commercial Trust Co. of New Jersey v. Miller, 281 Fed. 804 (C. C. A. 3), affirmed 262 U. S. 51, 43 Sup. Ct. 486, 67 L. Ed. 858. We are here concerned with captures on land only. By section 5 of the act the President is in terms authorized to "exercise any power or authority conferred by this Act through such officer or officers as he shall direct." Section 6 authorized the President to appoint and "prescribe the duties of" an official to be known as the Alien Property Custodian and empowered the Custodian to receive all money and property in the United States due or belonging to an enemy and to hold, administer and account for the same under the general direction of the President and as provided in the act. Section 7 (a) imposes upon all persons in the United States the duty of reporting to the Alien Property Custodian the enemy owned property within their control. Section 7 (c), as originally passed, authorized the president to require all enemy property to be paid, transferred or delivered to the Alien Property Custodian. An amendment of November 4, 1918 (40 Stat. 1020), makes the provisions of this subsection apply expressly to "patents, copyrights, applications therefor, and rights to apply for the same, trade-marks, choses in action, and rights and claims of every character and description" and authorizes the seizure by the Custodian of any property that the President might require to be paid, transferred or delivered to the Custodian.

[2] By an amendment of March 28, 1918 (40 Stat. 460 [Comp. St. 1918, Comp. St. Ann. Supp. 1919, § 3115½ff]), the fourth paragraph of section 12 was made to read as follows:

"The Alien Property Custodian shall be vested with all of the powers of a common-law trustee in respect of all property, other than money, which has been or shall be, or which has been or shall be required to be, conveyed, transferred, assigned, delivered, or paid over

to him in pursuance of the provisions of this Act, and, *in addition thereto*,[1] acting under the supervision and direction of the President, and under such rules and regulations as the President shall prescribe, shall have power to manage such property and do any act or things in respect thereof or make any disposition thereof or of any part thereof, by sale or otherwise, and exercise any rights or powers which may be or become appurtenant thereto or to the ownership thereof in like manner as though he were the absolute owner thereof: Provided, that any property sold under this act, except when sold to the United States, shall be sold only to American citizens, at public sale to the highest bidder, after public advertisement of time and place of sale which shall be where the property or a major portion thereof is situated, *unless the President stating the reasons therefor, in the public interest shall otherwise determine.*  *  *  * "

Under this amendment the powers granted with respect to the disposal of enemy property are broad, indeed. It first expressly authorizd "any" disposition, by sale or otherwise, as though the Custodian were the absolute owner thereof. Stoehr v. Wallace, 255 U. S. 239, 243, 41 Sup. Ct. 293, 65 L. Ed. 604. Whether under this broad power the Custodian, acting under the supervision and direction of the President, would have authority to destroy enemy property—for example, propaganda books and pamphlets, munitions of war unsuitable for America's use, or property whose mere presence here might constitute an actual or possible menace to the public health—need not be determined for the transaction here in question was a sale. But it is clear that, save as limited by the first proviso, the powers of sale conferred by the amendment are as broad as those of an absolute owner. An absolute owner may sell his property under any terms and conditions that he, in his absolute discretion, may deem proper. He may sell it at public sale to the highest bidder, as ordinarily he would do where the only advantage to be derived by him from the sale is directly monetary. He may likewise sell it at private sale to the low bidder. Indeed, he frequently does so if, in his opinion, there will accrue to him directly, or indirectly, from such sale benefits and advantages more than sufficient to offset and overcome the direct and immediate monetary loss. The proviso, however, recognizes that with respect to some enemy property the public interest may be peculiarly interwoven. It thus recognizes that enemy property may consist of two classes—the ordinary and usual class and a special class. For the former class the proviso, itself, prescribes and rigidly fixes the conditions of sale. With respect to the special class the last clause of the proviso—"unless the President stating the reasons therefor, in the public interest shall otherwise determine"—empowers the President to nullify any or all of the statutory conditions of sale prescribed for property of the ordinary and usual class. United States v. Standard Brewery, 251 U. S. 210, 218, 40 Sup. Ct. 139, 64 L. Ed. 229; Levinson v. United States, 258 U. S. 198, 201, 42 Sup. Ct. 275, 66 L. Ed. 563. It does more. It authorizes the President to substitute

[1] All italics throughout this opinion are mine unless otherwise indicated.
294 F.—20

other conditions in place of those nullified, for such is the meaning of "otherwise determine" when read in connection with the remainder of the amendment. But that is unimportant, for if the President, acting under the last clause of the proviso, removes the statutory conditions as to specified property, but does not prescribe other conditions of sale in place of the nullified statutory conditions, the provisions in the body of the amendment apply, and the Custodian, acting under the supervision and direction of the President, may sell such property as though he were the absolute owner thereof. I see no escape from the conclusion that as to property brought within the last clause of the proviso by presidential determination in the public interest the amendment permits a freedom of action with respect to the terms and conditions of sale ample to safeguard the public interest, whatsoever be the requirements of that interest and whatever be the character of the property sold.

[3] It is said by the plaintiff, however, that the fourth paragraph of section 12 of the act expressly makes the Custodian a common-law trustee; that, were this not true, the Custodian holds the enemy property in his possession only in his official capacity; that a public office is a public trust, and that as a trustee may not sell trust property for less than its fair monetary value the Custodian, a trustee, may not do so. It is true that by the act the Custodian is "vested with all of the powers of a common-law trustee in respect of all property" coming into his possession. But it is likewise true that to the Custodian, acting under the supervision and direction of the President, the statute grants *additional* powers including the express power to sell the trust property "as though he were the absolute owner thereof," if the President in the public interest removes the conditions and limitations of the proviso. The sales here in question were made not by virtue of the "common-law trustee" powers of the Custodian, but in the exercise of the additional powers. Yet, it is of course true that neither the President nor the Custodian is the owner of enemy property. "As though he were the absolute owner" was inserted in the act merely to state the extent and scope of the grant of additional power—not to confer upon the President or Custodian, personally, the beneficial interest in the property. Hence, in the sale of enemy property, all officers act in an official or fiduciary capacity. But because a trustee with only the usual powers may not ordinarily sell trust property at private sale for less than its fair monetary value, it by no means follows that the Custodian, acting under the supervision and direction of the President, may not do so. It will not be disputed, I take it, that the powers of a trustee over the trust property depend upon the nature of the trust and the terms of the instrument by which it is created. 26 R. C. L. 1279. Obviously the primary purpose of the Trading with the Enemy Act was the protection of the nation, not the benefit of the enemy. The trust thereby created was constituted for the benefit of the nation and the public at large. It was a public, not a private trust. In the disposal of property under the "additional" statutory powers the statute—the instrument creating the trust— makes the President the controlling factor and the Custodian his instru-

mentality or agent. In all such sales the statute requires the President to consider the public interest. Public interest is not a synonym for money. It may not be defined in terms of finance. It embraces all the great public needs. It permits dealing with the conditions which exist in the nation so as to bring out of them the greatest welfare of its people. With the safety of the nation, the permanence of peace and the health of its citizens it is vitally concerned. In the category of the great public needs these are not outranked by the nation's revenue.[2]

Considering the public interest in connection with the disposal of trust property requires the balancing in judgment and marshaling of the conflicting demands to which in the public interest the trust property is subject. The extent to which the trustee may act in conformity with a judgment so formed depends upon the scope of his powers. Where, as here, the powers granted with respect to the disposal of trust property are as broad as those of an absolute owner, the trustee is the judge, and, in the absence of fraud, the sole and exclusive judge, of the rank and priority to which each of the divers demands is entitled. Under such a trust there is confided to the keeping of the trustee not only the trust property but also the public interest to the extent that that interest is interwoven with the trust property or with its disposition. Under such a trust the trustee, in so far as the nature of the trust property permits, may in the sale of that property promote and advance the safety of the nation, the permanence of peace, the health of its citizens, or the national finances. He may promote and advance all, or he may promote and advance either at the expense of the others. If in his judgment the widespread use of the trust property would tend to advance the safety of the nation, the health of its citizens, or the permanence of peace, the property may in its disposition be devoted to the public use even though thereby its monetary value for purposes of sale would be substantially destroyed. Such powers are, in truth, broad. But they were granted in the public interest in time of war by Congress, in the exercise of its war powers, to him who, by virtue of his office, knows "the state of the Union" and is Commander in Chief of its Army and Navy.

[2] Since the above was written, what I conceive to be the same thought has been better expressed, with respect to the sale of Muscle Shoals, thus:

"While the price is an important element, there is another consideration even more compelling. The agriculture of the nation needs a greater supply and lower cost of fertilizer. This is now imported in large quantities. The best information I can secure indicates that present methods of power production would not be able profitably to meet the price at which these imports can be sold. To obtain a supply from this water power would require long and costly experimentation to perfect a process for cheap production. Otherwise our purpose would fail completely. It seems desirable, therefore, in order to protect and promote the public welfare, to have adequate covenants that such experimentation be made and carried on to success. The great advantage of low-priced nitrates must be secured for the direct benefit of the farmers and the indirect benefit of the public in time of peace, and of the government in time of war. If this main object be accomplished, the amount of money received for the property is not a primary or major consideration." President's Address to Congress, December, 1923, Congressional Record of Dec. 6, 1923.

The history of the times, the condition of the country, and the uses to which enemy property in America was being put by the enemy, serve but to confirm the intent of Congress as made manifest by the plain words of the amendment. On April 6, 1917, almost three years after the outbreak of the European conflict, and long after right upon right of this nation had been ignored and violated, Congress declared a state of war to exist. 40 Stat. 1650. Six months thereafter the Trading with the Enemy Act was passed. As originally passed the fourth paragraph of section 12 authorized a "disposition" of enemy property coming into the hands of the Custodian only "if and when necessary to prevent waste and protect such property and to the end that the interests of the United States in such property and rights or of such person as may ultimately become entitled thereto, or to the proceeds thereof, may be preserved and safeguarded." It was then purely a conservation act. Property rights were made pre-eminent and guarded with the greatest solicitude. America, bearing no malice, no hatred, no ill will toward any people, suspected no designs upon her sovereignty or the health of her citizens, and was suspicious of no misuse of the rights and opportunities she had freely granted to the subjects and nationals of the foe. There was then little accurate or definite knowledge as to the nature or extent of the German investment in the United States. While it was known to be large, it was not generally believed to be either powerful or particularly unfriendly to American interests. The Custodian became active. The reports of enemy-owned property called for by section 7 (a) of the act began to pour in. They came by the thousands. The extent of enemy ownership was amazing. It permeated every state of the Union and every territory and insular possession. It affected every industry. Some it monopolized. It amounted in value to hundreds of millions of dollars. Defendant's Exhibit No. 30, Ex. pp. 2103, 2104; R. pp. 2511, 2523–2525. Much of this property was not innocently held, or held solely for the purposes of trade and commerce. It was found that before the war a number of German-owned insurance companies had insured a large number of properties here which the insurance agents periodically inspected. Another large German-owned company erected and installed railways within industrial plants and mills. It had possession of their ground plans and knew the details of their construction and arrangement. All this and like information acquired by other German-owned companies had been transmitted, it was found, to Berlin and there collated, indexed, arranged, and made available to German competitors and to the German government. R. p. 2754; Plaintiff's Exhibit No. 16, Ex. pp. 566–568. A German-owned lumber company, located on Pensacola Bay, Florida, was seized by the Custodian. It was found to own "every advantageous place on the finest harbor in the Gulf of Mexico, the nearest harbor on American soil to the Panama Canal." Its files were filled, not with business papers, but with pan-German literature. It was "a distribution center for propaganda in this country." The Custodian found other properties that were similarly used. R. pp. 2535, 2536.

Let us turn to the chemical and pharmaceutical situation, to which the attention of the Custodian was early attracted. As head of the Alien Property Custodian's bureau of investigation, Francis P. Garvan began an investigation of this field. He was soon joined by Joseph H. Choate, Jr., who devoted himself exclusively to that task. R. pp. 3142, 3143. The inquiry was painstaking and exhaustive. Persons having knowledge of the situation were examined. Information gathered by the secret service and intelligence departments of the government and of its allies was availed of. Reports in the archives of the government were searched. Wireless messages passing between persons in the United States and in Germany during a period before America entered the war were inspected. Suspected persons were interrogated under oath and their books and papers examined. The salient facts thus obtained, the evils threatening the public interest, and the remedy by a sale of the German chemical and allied patents to the defendant as a means for bringing about their widespread use in the United States were stated and pointed out in the report (Defendant's Exhibit No. 30) made by the Custodian to the President on February 27, 1919, and by the President transmitted to Congress on March 1st. This report must speak for itself. It cannot be epitomized without depriving it of strength. It must suffice to state a few facts and then let the German Consul General portray the situation. At the outbreak of the war Germany had attained in the manufacture of dyestuffs and medicinals, not only the first place, but to all intents and purposes a world monopoly. Prior to that time American industry in dyestuffs and medicines consisted of little more than a series of rather small assembling plants. In medicinals very little real American manufacture existed. Scarcely any of the necessary intermediates were made here, and the manufacture of dyes was confined almost entirely to working upon intermediates imported from Germany. From time to time American citizens had become interested in the development of an American industry, but German bribery and dumping had prevented its success or destroyed it. The Germans applied for and were granted numerous patents. "As there was substantially no effort (with small exceptions) by any of the German concerns to manufacture in the United States, these patents were obviously obtained and held in order to prevent the formation of an American dye industry and to make impossible importation from other countries." Ex. p. 2139. The importation of chemicals and medicinals was cut off at the outbreak of the war. The effect upon America was duly reported to his government in Berlin, in March 1916, by the German Consul General, Hössenfelder. He said (Defendant's Exhibit No. 72, Ex. pp. 2519, 2520):

"Neither through money, nor the granting of credit, nor by any other means, can that critical situation be relieved which has been called forth by the removal of certain articles which are obtainable only in Germany. These articles are chiefly potash, chemicals, and dyestuffs. Potash is desired by agriculture, inclusive of the cotton planters, all the more urgently since even last year sufficient fertilizer could not be brought to the soil. To enumerate the industries which

are suffering from the scarcity of German chemicals would lead too far. *I may, however, mention that the cry for help which comes from the world of physicians is becoming louder and louder and more and more insistent.*

"The country, however, is being hit hardest by the lack of dye-stuffs, which makes itself felt more and more every day. * * * What the United States is able to produce in dyestuffs is neither in quality nor in shades in the remotest sufficient to meet the existing demands. It is now acknowledged here on all sides that the reports to the contrary of Mr. Norton are not only too optimistic but directly untrue. * * * In estimating the effect which will be produced by cutting off the importation of potash, chemicals, and dyestuffs it should be taken into consideration that the circle of persons affected is very extraordinarily large. Through the lack of dyestuffs alone not only is a whole list of important industries (wool, cotton, leather, paper industry, etc.), gradually made lame, but for the great public living becomes more expensive, both through the rise in price as well as through the small durability of all products for whose production colors are used. *We are here unquestionably face to face with conditions which are without a parallel in the past."*

Theretofore the German Ambassador to Washington had sent to Berlin this cablegram (Defendant's Exhibit No. 62, Ex. p. 2427):

"It is reported to me by Hossenfelder * * * that the stock of dyes in this country is so small that by a German embargo about 4,000,000 American workmen might be thrown out of employment."

With respect to the withholding of medicines from us, Dr. Julius Stieglitz, professor of chemistry at the University of Chicago and who during the war was chairman of the Committee on Synthetic Drugs of the National Research Council, the scientific adviser of the government (R. p. 3576), has since said:

"The pitiful calls of our hospitals for local anæsthetics to alleviate suffering on the operating table, the frantic appeals for the hypnotic that soothes the epileptic and staves off his seizure, the almost furious demands for remedy after remedy, that came in the early years of the war, are still ringing in the hearts of many of us."

The President of the United States, in his message of May 20, 1919, to Congress (Defendant's Exhibit No. 164, p. 2863), said:

"The experiences of the war have made it plain that in some cases too great reliance on foreign supply is *dangerous,* and that in determining certain parts of our tariff policy domestic considerations must be borne in mind which are political as well as economic. Among the industries to which special consideration should be given is that of the manufacture of dyestuffs and related chemicals. Our complete dependence upon German supplies before the war made the interruption of trade a cause of exceptional economic disturbance. The close relation between the manufacturer of dyestuffs, on the one hand, and of explosives and poisonous gases, on the other, moreover, has given the industry an exceptional significance and value. Although the United States will gladly and unhesitatingly join in the program of international disarmament, it will, nevertheless, be a pol-

icy of obvious prudence to make certain of the successful maintenance of many strong and well-equipped chemical plants. The German chemical industry, with which we will be brought into competition, was and may well be again, a thoroughly knit monopoly capable of exercising a competition of a peculiarly insidious and dangerous kind."

By her patent monopoly, by bribery and by dumping Germany had prevented the building up of an organic chemical industry in the United States. The relation of chemical plants operating in time of peace to the national defense in time of war was pointed out by the acting Secretary of War (Ex. pp. 2884, 2885) in these words: "I may state that such plants would be of unquestionable value to any government, and that their maintenance in time of peace, with the complete equipment would enable their output to be changed from dyestuffs to explosives in a week's time, [and] as claimed by Dr. Schoellkopf, would remove to a great extent the necessity for the erection and maintenance of special large plants for explosives for war purposes." The technical skill and equipment provided by an active chemical industry furnishes the means, and almost the sole means, to which the nation must look, in war and in peace, for advances in the application of chemical science to practical undertakings.

At the time of the passage of the March amendment America was, at home, truly "face to face with conditions * * * without a parallel in the past," but on the battle front she was engaged in conflict with an enemy waging a chemical warfare and passing from the use of deadly to more deadly gases. To America's credit be it said that she sought to refrain from the use of gas in warfare, forbidden by international convention. But it soon became apparent that America would be fighting on disastrously unequal terms unless she should make use of all the dread weapons being used against her by the foe. When Germany persisted in her attempts to destroy her opponents by waves and shells of poison gas in contravention of all international agreements. Germany made it manifest that America's future safety lay in America's chemical independence. It was obvious that chemical independence and readiness in time of war could only follow chemical independence and development in time of peace, for "the same plant that converts the benzene and the toluene, the anilin and the toluidin of the coal tar into flaming colors or into the pain-soothing or disease-curing medicinals" are ready "to convert in war time these crude products into the all powerful T. N. T., picric acid and similar" weapons of war. But American chemical independence could only follow an unfettered opportunity to develop that science. The amendment of March, 1918, was passed during the darkest days of the war. The Germans were striking blow after blow and making advance after advance. It was thought that Paris was about to fall and the Channel ports be taken. R. p. 2538. It looked as if upon America was to fall the burden of carrying the war to victory. Such were the circumstances under which Congress struck out the fourth paragraph of section 12 of the Trading with the Enemy Act, which authorized a disposition of enemy property only for purposes of conservation, and substituted in its stead a power of dis-

position in the public interest as broad as that of an absolute owner. The character of the change in the statute, the circumstances under which it was made, and the plain words of the amendment combine to make it clear that Congress saw that at least some enemy property was clothed with a public interest, and that it was the intent of Congress to subordinate mere property rights to the welfare of the nation; they combine to make it clear that in passing the March amendment it was the intent and purpose of Congress to permit enemy property clothed, in the judgment of the President, with a public interest affecting the safety of the nation, the permanence of peace or the health of its citizens, to be sold under such terms and conditions as would devote such property to the public use and thus give to the nation its greatest value and insure that not again, in peace or in war, should the health, the pain and the suffering of American citizens or the employment of American workmen or the safety of the nation itself be dependent upon the will of another nation or its nationals. The Trading with the Enemy Act was in full force at the time the sales in suit were made. Commercial Trust Co. v. Miller (C. C. A.) 281 Fed. 804, 806; Id., 262 U. S. 51, 57, 43 Sup. Ct. 486, 67 L. Ed. 858.

The plaintiff advances many reasons, however, why the amendment should not receive this construction. Of these the most fundamental, perhaps, is that it would permit partial, and possibly total, confiscation of enemy property; that confiscation of enemy property is in conflict with the law of nations, and that an act of Congress should not be construed to violate the law of nations, if any other construction is possible. Conceding, arguendo, that certain conditions of sale, though imposed in the interest of the nation, might be at least partially destructive of the monetary value of the property sold, and thus lessen the selling price, let us see if such confiscation, if confiscation it be, is in conflict with the law of nations. Inasmuch as this Government received the law of nations in its modern state of purity and refinement and for 130 years, as plaintiff in its brief points out, has observed that law in the face of all temptation, and has taken a leading part in upholding the principles of international right and the protection of private property in time of war, it is probably not necessary to go beyond the decisions of our own tribunals for guidance in ascertaining what that law is. Ware v. Hylton, 3 Dall. 199, 1 L. Ed. 568, was instituted by a subject of the king of Great Britain against citizens of the state of Virginia to recover a *debt* due at the outbreak of the Revolutionary War from the latter to the former. The defendant pleaded the confiscation of the debt by the state of Virginia. To this plea the plaintiff replied that the treaty of peace concluded between the United States and Great Britain provided "that the creditors of either side should meet with no lawful impediment to the recovery * * * of all bona fide debts theretofore contracted." The defendants demurred to the replication. Judgment was had by the plaintiff, not on the ground that the plea was bad, but on the ground that the replication was good.

Chase, Justice, at page 231, said: "From these observations, and the authority of Bynkershoek, Lee, Burlamaque and Rutherforth, I conclude, that Virginia had a right, as a sovereign and independent nation, to confiscate any British property within its territory, unless she had before delegated that power to congress, which Mr. Lewis contended she had done." And at page 235: "It appears to me, that the plea, by the defendant, of the act of assembly, and the payment agreeable to its provisions, which is admitted, is a bar to the plaintiff's action, for so much of his debt as he paid into the loan office; unless the plea is avoided or destroyed, by the plaintiff's replication of the fourth article of the definitive treaty of peace between Great Britain and the United States, on the 3d of September, 1783."

The view of Mr. Justice Paterson was expressed at page 254 thus: "It has been made a question, whether the confiscation of debts, which were contracted by individuals of different nations, in time of peace, and remain due to individuals of the enemy, in time of war, is authorized by the law of nations among civilized states? I shall not, however, controvert the position, that by the rigor of the law of nations, debts of the description just mentioned may be confiscated."

Mr. Justice Iredell, who sat in the court below, and who, though not voting, read the reasons given by him in support of the judgment of the Circuit Court, observed (at page 268): "If the state, de jure, according to the law of nations (which I strongly incline to think), had a right wholly to confiscate this debt, they had undoubtedly a right to proceed a partial way towards it, by receiving the money, and discharging the debtor, substituting itself in his place." At page 269: "For these reasons, I am clearly of opinion, that under the acts of sequestration, and the payment and discharge, the discharge will be a complete bar in the present case, unless there be something in the treaty of peace to revive the right of the creditor against the defendant, so as to disable the latter from availing himself of the payment into the treasury, in bar to the present action."

Wilson, Justice (page 281) states: "When the United States declared their independence, they were bound to receive the law of nations, in its modern state of purity and refinement. By every nation, whatever is its form of government, the confiscation of *debts* has long been considered disreputable; and we know, that not a single confiscation of that kind stained the code of any of the European powers, who were engaged in the war which our revolution produced." But he immediately adds: "Nor did any authority for the confiscation of debts proceed from Congress (that body, which clearly possessed the right of confiscation, as an incident of the powers of war and peace), and therefore in no instance can the act of confiscation be considered as an act of the nation."

In Brown v. United States, 8 Cranch, 110, at pages 122, 123 (3 L. Ed. 504), a case arising out of the War of 1812, Chief Justice Marshall, as to the right of confiscation, said: "Respecting the power of government no doubt is entertained. That war gives to the sovereign full right to take the persons and confiscate the property of the enemy wherever found, is conceded. The mitigations of this rigid

rule, which the humane and wise policy of modern times has introduced into practice, will more or less affect the exercise of this right, but cannot impair the right itself. That remains undiminished, and when the sovereign authority shall choose to bring it into operation, the judicial department must give effect to its will. But until that will shall be expressed, no power of condemnation can exist in the court." And at pages 128, 129: "When war breaks out, the question, what shall be done with enemy property? in our country, is a question rather of policy than of law. The rule which we apply to the property of our enemy, will be applied by him to the property of our citizens. Like all other *questions of policy,* it is proper for the consideration of a department which can modify it at will; not for the consideration of a department which can pursue only the law as it is written. It is proper for the consideration of the Legislature, not of the executive or judiciary."

In that case Mr. Justice Story, who held the view, contrary to that of a majority of the court, that the declaration of war in and of itself authorizes confiscation, said (page 143):

"On a review of authorities, I am entirely satisfied that, by the rigor of the law of nations and of the common law, the sovereign of a nation may lawfully confiscate the debts of his enemy, during war, or by way of reprisal; and I will add, that I think this opinion fully confirmed by the judgment of the Supreme Court in Ware v. Hylton, 3 Dall. 199, where the doctrine was explicitly asserted by some of the judges, reluctantly admitted by others, and denied by none.

"In respect to the goods of an enemy found within the dominions of a belligerent power, the right of confiscation is most amply admitted by Grotius, and Puffendorf, and Bynkershoek, and Burlamaqui, and Rutherforth, and Vattel. See Grotius, and Puffendorf, and Bynkershoek, ubi supra; and Bynk. Qu. Pub. Jur. c. 4, and 6; 2 Burlam. p. 209, § 12, p. 219, section 2, p. 221, and section 11; Ruth. lib. 2, c. 9, p. 558 to 573. Such, also, is the rule of the common law. Hale, in Harg. Law Tracts, p. 245, c. 18."

On August 6, 1861, and July 17, 1862, the Congress passed statutes, commonly termed the Confiscation Acts (12 Stat. 319, 589), providing for the seizure and sale of enemy property. Wherever brought in question, these acts have been uniformly upheld as a legitimate exercise of the war power of the nation. In Miller v. United States, 11 Wall. 268, 20 L. Ed. 135, it was urged that these acts were unconstitutional. The court in overruling this contention said at pages 305, 306:

"The question, therefore, is whether the action of Congress was a legitimate exercise of the war power. The Constitution confers upon Congress expressly power to declare war, grant letters of marque and reprisal, and make rules respecting captures on land and water. Upon the exercise of these powers no restrictions are imposed. Of course the power to declare war involves the power to prosecute it by all means and in any manner in which war may be legitimately prosecuted. It therefore includes the right to seize and confiscate all property of an enemy and to dispose of it at the will of the captor.

This is and always has been an undoubted belligerent right. If there were any uncertainty respecting the existence of such a right it would be set at rest by the express grant of power to make rules respecting captures on land and water. It is argued that, though there are no express constitutional restrictions upon the power of Congress to declare and prosecute war, or to make rules respecting captures on land and water, there are restrictions implied in the nature of the powers themselves. Hence it is said the power to prosecute war is only a power to prosecute it according to the law of nations, and a power to make rules respecting captures is a power to make such rules only as are within the laws of nations. Whether this is so or not we do not care to inquire, for it is not necessary to the present case. It is sufficient that the right to confiscate the property of all public enemies is a conceded right. Now, what is that right, and why is it allowed? It may be remarked that it has no reference whatever to the personal guilt of the owner of confiscated property, and the act of confiscation is not a proceeding against him. The confiscation is not because of crime, but because of the relation of the property to the opposing belligerent, a relation in which it has been brought in consequence of its ownership. It is immaterial to it whether the owner be an alien or a friend, or even a citizen or subject of the power that attempts to appropriate the property. In either case the property may be liable to confiscation under the rules of war. It is certainly enough to warrant the exercise of this belligerent right that the owner be a resident of the enemy's country, no matter what his nationality. The whole doctrine of confiscation is built upon the foundation that it is an instrument of coercion, which, by depriving an enemy of property within reach of his power, whether within his territory or without it, impairs his ability to resist the confiscating government, while at the same time it furnishes to that government means for carrying on the war. Hence any property which the enemy can use, either by actual appropriation or by the exercise of control over its owner, or which the adherents of the enemy have the power of devoting to the enemy's use, is a proper subject of confiscation."

The Spanish-American war was followed by Juragua Iron Co. v. United States, 212 U. S. 297, 29 Sup. Ct. 385, 53 L. Ed. 520, and Herrera v. United States, 222 U. S. 558, 32 Sup. Ct. 179, 56 L. Ed. 316. In the former the court (212 U. S. at page 306, 29 Sup. Ct. 388), quotes with approval the language of Miller v. United States that "it is sufficient that the right to confiscate the property of all public enemies is a conceded right." In the Herrera Case the court (222 U. S. at pages 571–572, 32 Sup. Ct. 183), referring to The Grapeshot, 9 Wall. 129, 19 L. Ed. 651, observed:

"But it was not intended to express a limitation upon the undoubted belligerent right to use and confiscate all property of an enemy and to dispose of it at will."

[4-6] That there are no restrictions upon the war power of Congress to confiscate enemy-owned property is, as I venture to think, no longer debatable. Yet, while the right of the nation to confiscate enemy property is absolute, the extent to which that right shall be exercised

during any particular war is a matter of policy to be determined solely by Congress in the passage of its war measures. Courts may inquire whether an act passed by Congress is within the scope of its constitutional *power*. Beyond this they may not go. The scope of judicial inquiry does not extend to a review of legislative *policy*. Whether a legislative act is wise or unwise, whether it is based on sound theory or principle, are matters solely for the judgment of Congress. Such matters are not within the range of judicial cognizance. Chicago, B. & Q. R. Co. v. McGuire, 219 U. S. 549, 569, 31 Sup. Ct. 259, 55 L. Ed. 328; German Alliance Ins. Co. v. Lewis, 233 U. S. 389, 414, 34 Sup. Ct. 612, 58 L. Ed. 1011, L. R. A. 1915C, 1189; Hamilton v. Kentucky Distilleries Co., 251 U. S. 146, 161, 40 Sup. Ct. 106, 64 L. Ed. 194. If it be supposed, as sometimes it is supposed, that there resides in the court a power to fashion and mould a statute according to its own notions of justice, of wisdom, or of policy, I know of no such power. The judicial function is to give voice and effect to the law as it is—not to make the law. Moreover, the tendency of modern enlightened nations to exempt, as a general rule, enemy property from confiscation arose with respect to debts and property acquired in the usual course of trade. Magna Charta, § 41; Lawrence's Wheaton on International Law, pp. 526, 536. "It is not an immutable rule of law, but depends on political considerations which may continually vary." Chief Justice Marshall in Brown v. United States, 8 Cranch, 110, 128, 3 L. Ed. 504. Consequently, it is not surprising that no authority has been cited and none has been found showing that the modern usage has ever been extended to property whose return to the enemy might jeopardize the interest, the welfare, the safety or the independence of the capturing nation. On the contrary, it affirmatively appears that it has been recognized, only recently, that certain property does not fall within the modern liberal rule. Interpreting the Act of Congress of August 6, 1861, the Supreme Court in Kirk v. Lynd, 106 U. S. 315, 316, 317, 1 Sup. Ct. 296, 297 (27 L. Ed. 193), after quoting Miller v. United States, supra, that the statute "was aimed exclusively at the seizure and *confiscation* of property used to aid, abet, or promote the rebellion, then a war, or to maintain the war against the government," said:

"In war the capture of property in the hands of the enemy, used, or intended to be used, for hostile purposes, is allowed by all civilized nations, and this whether the ownership be public or private."

The principle of that case would seem to extend to all enemy property affecting the public interest of the nation. Moreover, it is readily seen that political considerations and a due regard for the public interest would leave the capturing nation without choice in the matter of the retention or return of certain enemy property, for instance, property whose return would leave the capturing nation without modern weapons of war, or opportunity to produce them, and so defenseless. Construed according to its plain language and without resort to extrinsic facts, I think the amendment is not in conflict with the rules of international law with respect to the confiscation of enemy property, but in consonance, rather, with the most modern practice of the most

enlightened nations relating thereto. Construed in the light of the history of the times, the condition of the country and the uses being made of enemy property in America, the result is the same.

The examination of plaintiff's contention with respect to confiscation should not be concluded, however, without an investigation and appreciation of its full significance.

It is not denied—in fact, it is one of the premises upon which plaintiff plants its case—that, speaking abstractly, it is possible to impose conditions of sale that will destroy in whole or in part the value of the property sold. This is equally true, whether the sale be public or private. If it is confiscation to impose at a private sale conditions that will prevent the proceeds of sale of enemy property from being equal in value to the property of which the enemy owner is deprived, it is, of course, confiscation if the same conditions, or other conditions having the like effect, are imposed at a public sale. But if international law or the enlightened practice thereunder forbids the former, the latter is likewise forbidden. Consequently, if the statute itself directly and expressly imposes conditions of sale under which the proceeds of sale would inevitably be less than the value of the property to its enemy owner, such statutory conditions of sale would be confiscatory and fall under the ban of plaintiff's contention in the same manner as the conditions imposed with respect to the sale of the property in suit. Yet it cannot be denied that the statute authorizes a sale of any enemy property coming into the possession of the Custodian; that the amendment of November, 1918, expressly authorizes the seizure and disposal of enemy-owned patents; and that the March amendment requires, in the absence of presidential action, "that any property sold under this act * * * shall be sold only to American citizens." Dr. Holderman testified that the Haber process patents were worth millions of dollars to their original German owners. R. p. 2381. Yet the evidence is overwhelming that the Haber process patents were and are without substantial affirmative value to American citizens. R. pp. 3820-3822, 3971-3973, 4013-4015.

Had those patents been sold to American citizens at public sale, instead of at private sale, and only the net proceeds of such sale paid to their former enemy owners, those owners would have suffered an almost total loss in the value of their property. If that is not confiscation, a similar result produced by conditions imposed at a private sale is not confiscation, and plaintiff's contention with respect to confiscation is without merit. If it is confiscation, it follows that the plaintiff's contention is of a character to prevent or nullify that which the statute, section 7 (c) and section 12 as amended, expressly authorizes, namely, the sale of enemy owned patents to American citizens only. It would prevent or nullify the sale, either public or private, of every enemy-owned patent having any real value to its original enemy owner. This is true, for that which has been said with respect to the Haber patents applies in greater, lesser, or like degree to practically all enemy patents. American citizens, or, for that matter, allies and neutrals, could pay for enemy patents, without regard to whether the sale is public or private, not more than a fractional part of the value

such patents would have to the former enemy owner. The title to the patents was uncertain. They might have been assigned, or licenses on nominal terms might have been granted to neutrals by the enemy owners prior to sale, and these facts have been unknown to American citizens. Yet when sold under the Trading with the Enemy Act they are accompanied by no warranty of title. The patents might be perfectly valid and so known to be by their German owners. Yet they were unadjudicated, and an American citizen by reason of the war would be unable to satisfy himself upon this point. For the most part the German patents had not been used in the United States. An American citizen, purchasing the patents under the statute, would not be able to obtain from the inventor or the German owner the benefit of the inventor's practical experience in arriving at the invention or the German owner's practical experience in operating thereunder. "From the nature of the property, the real value of patents can only be determined after the invention is introduced and in use." Insurance Press v. Montauk Wire Co., 103 App. Div. 472, 475, 93 N. Y. Supp. 134, 137. "The value of a patent is in its nature speculative." Alpha Portland Cement Co. v. Schratweiser (C. C. A. 2) 221 Fed. 258, 259, 137 C. C. A. 111.

German patents had a bad reputation. In a book published in 1917—Seward's Science and the Nation, Defendant's Exhibit 50, p. 18—Sir William Pope was quoted as saying: "In fact, some German patents are drawn up for the purpose of discouraging investigation by more practical methods; thus, any one who attempted to repeat the method for manufacturing a dyestuff protected by Salzmann & Krueger in the German patent No. 12,096 would be pretty certain to kill himself during the operation."

In the official report of the Department of Commerce, 1915, Special Agent Series No. 96 (Defendant's Exhibit No. 51, p. 48), it was said: "It is claimed with authority that not over 1 per cent. of the German patents in this industry [dyestuffs] have ever proved remunerative." Dr. George W. McCoy, Director of the laboratory of the United States Public Health Service, and a witness for the plaintiff in this case testifying before the Committee on Interstate and Foreign Commerce of the House of Representatives with respect to the salversan patents (R. pp. 4454–4455), said:

"Dr. McCoy: The processes, as described by the patents, I am told —now, this is hearsay—are the very minimum required to secure the patent, and in no way adequate to enable even a competent chemist to reproduce the material.

"Mr. Huddleston: So that the parties who are now producing a satisfactory quality of this product are not proceeding by the formula as filed in the Patent Office, but are proceeding as their experience has taught them, having figured out in some way how to produce this substance?

"Dr. McCoy: Yes; that is a fair statement. * * *

"Dr. McCoy: I have talked that matter with some of the most able chemists in the United States, and they all say that the description in the patent is so sketchy, and there is so much necessary that is omitted,

that a well-qualified chemist cannot proceed and produce the material. He has to do a great deal of experimenting. I know one large, well-equipped manufacturing house, commanding the best chemical talent money can secure, that spent about 18 months before they turned out the first commercial batch of salversan."

[7, 8] That which was testified to by Dr. McCoy before the congressional committee is established by the evidence in this case with respect to the chemical and pharmaceutical patents generally. These and other obvious risks and hazards incident to the purchase of enemy patents make it clear that from a business point of view they constituted an investment of a most highly speculative character. Their certain affirmative value was too slight and problematical to warrant the payment by American citizens of a sum even remotely approximating what they may have been worth to the German owners for monopolistic or other purposes. Any ability to practice the process of the patents or to make the products thereof that might become apparent after sale as a result of long periods of costly experiments, or otherwise, is without practical evidential value in determining what an American citizen would have been justified in paying for the patents or would pay for them before such ability became apparent. Nor could any knowledge, howsoever acquired by an American citizen, prior to sale, of how to use an enemy patent, be properly considered in estimating the value to an American citizen of the naked patent, unless that information was disclosed by the patent itself, or was known to the man skilled in the art of the patent. As a sale of the naked enemy patents under the express conditions of sale laid down in the Trading with the Enemy Act could produce only a fractional part of the value of such property to the original enemy owner, it is manifest that the upholding of plaintiff's contention with respect to confiscation would be destructive in a large measure of the express provisions of the act. But, in any event, neither the power to seize the property in suit nor the lawfulness of that seizure is denied. R. p. 2767.

The price at which property so seized is sold is not decisive of the amount of indemnity, if any, that will be paid to the original enemy owner for such seizure and sale. In the matter of indemnity the courts are without jurisdiction. That is a matter for other departments of the government. It was said in Young v. United States, 97 U. S. 39, 60 (24 L. Ed. 992): " * * * An aggrieved enemy must look alone for his indemnity to the terms upon which he agrees to close the conflict." By the Treaty of Berlin, Germany gave to the United States and the United States accepted the benefits of the Treaty of Versailles. By the latter treaty it was provided that as between the Allies and Associated Powers, or their nationals, on the one hand, and Germany, or her nationals, on the other hand, all the exceptional war measures, or measures of transfer, or acts done or to be done in execution of such measures, in paragraphs 1 and 3 of the Annex, should, with certain reservations not here pertinent, be considered as final and binding upon all persons. Treaty of Versailles, part X, art. 297 (d). By paragraph 1 of the Annex to that article of the treaty the validity of all orders, directions, decisions or instructions made or given or purporting to be

made or given with regard to enemy property, rights and interests was confirmed, and it was there provided that no question should be raised as to the regularity of a transfer of any property, rights, or interests dealt with in pursuance of any such order, direction, decision, or instruction. Furthermore by paragraph (i) of the same article of the treaty Germany undertook to compensate her nationals in respect of the sale or retention of their property, rights or interests in Allied or Associated states. Manifestly all claims of Germany and Germany's nationals to the property in suit are barred. Herrera v. United States, 222 U. S. 558, 574, 32 Sup. Ct. 179, 56 L. Ed. 316. If Germany or Germany's nationals are incidentally suffering from the exercise by the United States of its constitutional powers and its confirmed acts, it is for Congress, not for the executive or for the courts, in a suit prosecuted by the Attorney General or otherwise, to determine whether under the circumstances of the particular case justice requires that compensation or additional compensation be made. Union Bridge Co. v. U. S., 204 U. S. 364, 403, 27 Sup. Ct. 367, 51 L. Ed. 523.

I think the construction hereinbefore placed upon the Trading with the Enemy Act is neither forbidden nor made doubtful by any law or practice of nations with respect to enemy property.

[9] Turning from questions of international law, the plaintiff urges that the construction hereinbefore placed upon the Trading with the Enemy Act brings it in conflict with the Constitution of the United States, in that the power to confiscate enemy property is a legislative power, and cannot be delegated either to the Custodian, acting under the supervision and direction of the President, or to the President. That Congress cannot delegate its legislative power is, of course, not questioned. But in the Trading with the Enemy Act there is no delegation of legislative power. The statute is, in practical effect, in the alternative. It contemplates the existence of two classes of enemy property—the ordinary and usual class and a special class distinguished from the former by its relation to the public interest. The statute places upon the President the duty of dividing the enemy property into those classes by placing upon him the duty of designating the property of the latter class. With respect to each of these classes the powers of the executive officers are fixed by the statute. For the sale of property of the usual class the conditions of sale are expressly fixed by the statute. In the disposition of property of the special class—with which the public interest is interwoven—the powers of sale are as broad as those of an absolute owner. Neither in the determination of the fact that certain enemy property is linked with the public interest nor in the exercise of the discretion with respect to the terms and conditions of its sale—matters within the discretion of an absolute owner—is there to be found the exercise of a legislative power. The leading case upon this question is Field v. Clark, 143 U. S. 649, 12 Sup. Ct. 495, 36 L. Ed. 294. The court (143 U. S. at pages 693, 694, 12 Sup. Ct. 505) said:

" 'The true distinction,' as Judge Ranney, speaking for the Supreme Court of Ohio, has well said, 'is between the delegation of power to make the law, which necessarily involves a discretion as to what it shall be, and conferring authority or discretion as to its execution, to be exercised under and in pursuance of the law. The first cannot be

done; to the latter no valid objection can be made.' Cincinnati, Wilmington, etc., Railroad v. Commissioners, 1 Ohio St. 88. In Moers v. City of Reading, 21 Penn. St. 188, 202, the language of the court was: 'Half the statutes on our books are in the alternative, depending on the discretion of some person or persons to whom is confided the duty of determining whether the proper occasion exists for executing them. But it cannot be said that the exercise of such discretion is the making of the law.' So in Locke's Appeal, 72 Penn. St. 491, 498: 'To assert that a law is less than a law, because it is made to depend on a future event or act, is to rob the Legislature of the power to act wisely for the public welfare whenever a law is passed relating to a state of affairs not yet developed, or to things future and impossible to fully know.' The proper distinction the court said was this: "The Legislature cannot delegate its power to make a law; but it can make a law to delegate a power to determine some fact or state of things upon which the law makes, or intends to make, its own action depend. To deny this would be to stop the wheels of government. There are many things upon which wise and useful legislation must depend which cannot be known to the law-making power, and, must, therefore, be a subject of inquiry and determination outside of the halls of legislation.' "

The objection now urged to the validity of the March amendment, if given the meaning hereinbefore attributed to it, has frequently been urged with respect to the validity of section 18 of the River and Harbor Act of March 3, 1899 (30 Stat. 1153 [section 9970, Comp. St.]). That statute authorizes the Secretary of War (1) to determine that a bridge constructed over a navigable waterway is an unreasonable obstruction to the free navigation of such waters, and (2) to specify the changes required to be made. In Union Bridge Co. v. United States, 204 U. S. 364, 27 Sup. Ct. 367, 51 L. E. 523, arising under that statute, Field v. Clark and many other cases are reviewed. In Monongahela Bridge v. United States, 216 U. S. 177, 192, 30 Sup. Ct. 356, 360 (54 L. Ed. 435), the court summarized its prior decisions thus:

"That section 18 of the River and Harbor Act of March 3, 1899, 30 Stat. 1151, could not reasonably be taken as a delegation of legislative and judicial power to an executive department of the government; that the statute did not in any real, constitutional sense delegate to the Secretary of War any power that must, under our system of government, be exclusively exercised either by the legislative or judicial branch of the government; that under its paramount power to regulate commerce on and over the navigable waters of the United States Congress could require that such waters be freed from unreasonable obstructions to navigation; that the statute in effect prescribed the general rule, applicable to all navigable waters, that free navigation should not be hampered by unreasonable obstructions arising from bridges of insufficient height, width of span or other defects; that instead of exerting its power by direct legislation in each case of a bridge alleged to constitute an unreasonable obstruction to navigation, Congress charged the Secretary of War with the duty of ascertaining, in each case, upon notice to the parties concerned, whether the particular bridge came within the general rule prescribed; that any other method was imprac-

ticable in view of the vast and varied interests of the nation requiring legislation from time to time; that the Secretary of War, proceeding under the act of 1899, could not be said to exercise strictly legislative or judicial power any more than when, upon investigation, the head of a department ascertains, under the direction of Congress, whether a particular applicant for a pension belonged to a class of persons who, under a general rule prescribed by Congress, were entitled to pensions; and that a denial to Congress of authority, under the Constitution, to delegate to an executive department or officer the power to determine some fact or some state of things upon which the enforcement of its enactment may depend would often render it impossible or impracticable to conduct the public business, and to successfully carry on the operations of the government."

In my opinion the position of plaintiff is not well taken.

[10] The plaintiff further urges that the construction hereinbefore placed upon the amendment to section 12 of the Trading with the Enemy Act would bring it in conflict with the Fifth Amendment to the Constitution, in that it would permit the confiscation of property of American citizens "resident within the territory * * * of any nation with which the United States is at war," "enemies" by virtue of section 2 of the act (Comp. St. 1918, Comp. St. Ann. Supp. 1919, § 3115½aa). The same objection was raised in Miller v. United States, 11 Wall. 268, 304 (20 L. Ed. 135), with respect to the Civil War Confiscation Acts. The court said:

" * * * If the statutes were not enacted under the municipal power of Congress to legislate for the punishment of crimes against the sovereignty of the United States, if, on the contrary, they are an exercise of the war powers of the government, it is clear they are not affected by the restrictions imposed by the Fifth and Sixth Amendments. * * * The confiscation is not because of crime, but because of the relation of the property to the opposing belligerent, a relation in which it has been brought in consequence of its ownership. It is immaterial to it whether the owner be an alien or a friend, or even a citizen or subject of the power that attempts to appropriate the property. In either case the property may be liable to confiscation under the rules of war. It is certainly enough to warrant the exercise of this belligerent right that the owner be a resident of the enemy's country, no matter what his nationality."

In Juragua Iron Co. v. United States, 212 U. S. 297, 308, 29 Sup. Ct. 385, 389 (53 L. Ed. 520), the court quoted with approval from Whiting's War Powers under the Constitution as follows: "A neutral or a citizen of the United States, domiciled in the enemy's country, not only in respect to his property, but also as to his capacity to sue, is deemed as much an alien enemy as a person actually born under the allegiance and residing within the dominions of the hostile nation." The point having been expressly decided by the Supreme Court, there is here neither occasion nor room for its discussion.

[11-13] Plaintiff's next contention is not that the construction placed upon the amendment of March, 1918, would render *that* amendment unconstitutional but that it would bring into conflict with the Fifth

Amendment to the Constitution that portion of the amendment of November, 1918, to section 7 (c) of the act (Comp. St. Ann. Supp. 1919, § 3115½d), which provides:

"The sole relief and remedy of any person having any claim to any money or other property heretofore or hereafter conveyed, transferred, assigned, delivered, or paid over to the Alien Property Custodian, or required so to be, or seized by him shall be that provided by the terms of this Act, and in the event of sale or other disposition of such property by the Alien Property Custodian, shall be limited to and enforced against the net proceeds received therefrom and held by the Alien Property Custodian or by the Treasurer of the United States."

That provision applies only to citizens, allies, and neutrals whose property has been mistakenly seized or seized and sold. It does not apply to "enemies or allies of enemies." Sigg-Fehr v. White, 285 Fed. 949, 952, 52 App. D. C. 215, 218. Section 7 (c) is not directly involved in this suit. Plaintiff's theory with respect to the last clause of that section, as I understand its theory, is that persons not enemies or allies of enemies under the act are entitled, by virtue of the Fifth Amendment of the Constitution, to just compensation for any property of theirs that may be seized and sold under the belief that it is enemy property; that any property sold under the March amendment may mistakenly include property belonging to persons not enemies or allies of enemies; that if such property may be sold for less than just compensation it would render unconstitutional the provision limiting the relief of allies, neutrals, and resident citizens to the net proceeds received for their property; and that a statute should be construed as a whole, so as, if possible, to bring no part into conflict with a constitutional provision. But if it be clear that the validity of sales made under the express statutory conditions of the March amendment is not dependent upon whether or not the proceeds of sale amount to just compensation, it may not be presumed that there is any implied requirement that the proceeds of a sale made otherwise than under the statutory conditions must amount to just compensation. It cannot be denied that property actually enemy owned was the dominant theme of the March amendment—the only property within its direct aim. With respect to such property the Fifth Amendment, as we have just seen in Miller v. United States and in Juragua Iron Co. v. United States, is without application. The statutory conditions are "that any property sold under this act * * * shall be sold only to American citizens, at public sale to the highest bidder, after public advertisement of time and place of sale which shall be where the property or a major portion thereof is situated. * * *" That is all. There is no express requirement that at such a sale the proceeds must equal just compensation. Were there such a requirement, when and by whom would it be determined whether the proceeds of sale are equivalent to just compensation? Not by the officers making the sale, for the determination of what constitutes just compensation is a judicial, not an executive or a congressional, function. United States v. New River Collieries, 262 U. S. 341, 43 Sup. Ct. 565, 67 L. Ed. 1014; Monongahela Navigation Co. v. United States, 148 U. S. 312, 327, 13 Sup. Ct. 622, 37 L. Ed. 463.

But there is no statutory provision for judicial confirmation of the sale. Does the question remain open and the validity of the sale hang in the balance until determined in a suit instituted against the purchaser by the United States urged to diligence by no statute of limitation? Such a possibility would make every purchase a speculation, a purchase price equivalent to just compensation a remote contingency and the statute self-destructive. Nor are the bare statutory conditions laid down in the proviso of the March amendment adequate to make certain that the purchase price will in fact invariably amount to just compensation. The advertisements, though made in strict conformity with the statute and in the utmost good faith, may not be seen by any persons particularly interested in the property to be sold. Storms may prevent the attendance of many bidders. The bidders in attendance may not know how to use the property offered for sale or be appreciative of its true value. A judicial determination that the price received for property sold under the bare statutory conditions amounts as a matter of law in all cases and under all circumstances to just compensation for the property sold would be a judicial stultification. It would devitalize the Fifth Amendment. The field of operation of the last clause of the November amendment is narrow. It is not of the gist of the statute. It is but an incidental provision. It does not even provide the sole or main relief for persons whose property has been mistakenly seized, the primary relief being that prescribed by section 9 (Comp. St. 1918, Comp. St. Ann. Supp. 1919, § 3115½e). Ahrenfeldt v. Miller, 282 Fed. 944 (C. C. A. 3); Kahn v. Garvan (D. C.) 263 Fed. 909, 916. Its constitutionality is not raised by the facts of this case and is not decided. I think it sufficient to say that, whether it is valid as to property of American citizens not enemies under the act, allies and neutrals, or any of them (see New York Central R. Co. v. Winfield, 244 U. S. 147, 37 Sup. Ct. 546, 61 L. Ed. 1045, L. R. A. 1918C, 439, Ann. Cas. 1917D, 1139), it casts no doubt upon the compelling clearness of purpose evident in the language of the amendment of March, 1918, with respect to property actually enemy owned.

[14] Passing from objections based upon the Constitution to one founded solely upon the statute itself, the plaintiff urges that the construction heretofore placed upon the Trading with the Enemy Act as amended is inconsistent with the sixth paragraph of section 12 of that act which provides: "After the end of the war any claim of any enemy or of an ally of enemy to any money or other property received and held by the Alien Property Custodian or deposited in the United States Treasury, shall be settled as Congress shall direct." The amount of enemy property and money subject to congressional action after the war was necessarily dependent upon the extent, the terms and the conditions of the disposition thereof by Congress during the war—not contrariwise. Acts of executive officers done during the war in the exercise of the powers of disposal conferred upon them by Congress have the same force and effect "that would have been accorded to direct action" by Congress. See Monongahela Bridge v. United States, 216 U. S. 177, 195, 30 Sup. Ct. 356, 54 L. Ed. 435.

The sixth paragraph of section 12 of the act did not purport to control or prescribe the powers of disposition of enemy property during the war or the terms and conditions of such disposal. Those matters were expressly dealt with by other provisions of the act and particularly by the amendment of March, 1918. In the construction of that amendment I think the sixth paragraph of section 12 of the act affords no material guidance. The construction hereinbefore placed upon the Trading with the Enemy Act must stand.

[15, 16] That the power conferred by the statute was not validly exercised is a further contention of the plaintiff. It takes the position that the power conferred upon the President by the March amendment could be exercised only by the President in person. With certain exceptions not here pertinent the President by an order of December 3, 1918, vested in Frank L. Polk all power and authority conferred upon the President by the provisions of section 12 of the act as amended. Mr. Polk was the Solicitor of the Department of State and as such an officer of the United States. The orders with respect to the property in suit were made by Mr. Polk on February 26 and April 5, 1919. In the view of the plaintiff these orders are a nullity. A similar objection was made in Stoehr v. Wallace, 255 U. S. 239, 41 Sup. Ct. 293, 65 L. Ed. 604, which arose under that portion of section 7 (c) of the act as amended dealing with property of persons "who shall have been determined by the President, after investigation, to be an enemy or ally of enemy." The President directed that that power be exercised by the Custodian. It was contended that the act of the Custodian determining after investigation the enemy ownership of the property in suit was void. The court (255 U. S. at pages 244, 245, 41 Sup. Ct. 296) said:

"Whether the objection would be good if it turned entirely on the words of section 7c, on which the plaintiff relies, we need not consider; for they obviously are qualified and explained by section 5, which very plainly enables the President to exercise his power under section 7c 'through such officer or officers as he shall direct.' By the orders already noticed the President directed that this power be exercised through the Alien Property Custodian. It therefore is as if the words relied on had been 'which the President, acting through the Alien Property Custodian, shall determine after investigation' is enemy-owned, etc. In short, a personal determination by the President is not required; he may act through the Custodian, and a determination by the latter is in effect the act of the President. Central Union Trust Co. v. Garvan, 254 U. S. 554; The Confiscation Cases, 20 Wall. 92, 109."

The words of section 5 are, in my opinion, as applicable to the amendment to section 12 as to the amendment to section 7 (c).

[17-19] The validity of the order of the President of December 3, 1918, is further challenged because, as plaintiff interprets the order, the power therein conferred upon Mr. Polk was to be exercised by him in his personal capacity and not as an officer of the United States. It is true that the words "as Solicitor of the Department of State" do not follow the name of Mr. Polk or appear elsewhere in

the order. But it is likewise true that Mr. Polk was Solicitor of the Department of State and as such an officer of the United States. He was not lacking in capacity to exercise the powers granted. The mere addition or omission of the official designation after the name of a person is not conclusive upon the question of the capacity in which he acts. 6 R. C. L. 877; 22 R. C. L. 476. A striking illustration of this principle is found in Exhibit M to the bill of complaint. That document, signed by our late lamented President, though clearly an official act, in terms nowhere alludes to the office of President. It cannot be presumed that, in making the order of December 3, 1918, the President was doing a vain thing. On the contrary, there is a presumption of law that every public officer acts rightly. The maxim is "omnia præsumuntur rite esse acta." That construction which sustains and vitalizes an instrument should be preferred to that which strikes down and paralyzes it. United States Fidelity & G. Co. v. Board of Com'rs, 145 Fed. 144, 149, 76 C. C. A. 114 (C. C. A. 8). There are in the order no affirmative words showing unmistakably that the grant of power was made to Mr. Polk in his personal capacity. The objection stands wholly upon the failure to insert in the order after Mr. Polk's name the words "Solicitor of the Department of State." This fact is not sufficient, I think, to invalidate the order. Moreover, the sales to the defendant authorized and directed by Mr. Polk were ratified by the President himself by order of February 13, 1920.

[20] It is asserted that the purpose of sale was not to secure a fair value for the property, but to promote the interest of the dye and chemical industries, and that the transaction was in legal effect the granting of a subsidy to private industry. This challenge of the motives of the officers making the sale is supported, I think, neither by the facts nor by the law. Property becomes "clothed with a public interest when used in a manner to make it of public consequence and affect the community at large." Munn v. Illinois, 94 U. S. 113, 126 (24 L. Ed. 77). In Clark v. Nash, 198 U. S. 361, 25 Sup. Ct. 676, 49 L. Ed. 1085, 4 Ann. Cas. 1171, a use of property was declared to be public which, independent of the conditions existing in the state, might otherwise have been considered as private. This was reaffirmed in Bacon v. Walker, 204 U. S. 311, 315, 27 Sup. Ct. 289, 51 L. Ed. 499. See, also, Block v. Hirsh, 256 U. S. 135, 155, 41 Sup. Ct. 458, 65 L. Ed. 865, 16 A. L. R. 165; Noble State Bank v. Haskell, 219 U. S. 104, 110, 31 Sup. Ct. 186, 55 L. Ed. 112, 32 L. R. A. (N. S.) 1062, Ann. Cas. 1912A, 487; Id., 219 U. S. 575, 31 Sup. Ct. 299, 55 L. Ed. 341. The extent to which the property in suit is of public consequence and how greatly its use affects the community at large has already been pointed out, as has also the fact that the greatest value of the property to the nation lay in its use, not in its monetary worth. Mr. Polk, in whom resided the power to decide the matter, determined that "the public interest will be best served by a wide use of the inventions covered by said letters patent and similar rights." Order of Feb. 26, 1919, R. vol. 1, p. 551. To serve that interest and to obtain for the nation the greatest benefit, it was essential that the

property should be devoted to the public use. If the property was sold under such terms and conditions as to assure its being devoted to the public use, it matters not what benefits or detriments may have flowed as incidents therefrom. It therefore becomes pertinent to inquire whether the terms and conditions under which the property was sold were such as to afford assurances that it would be and remain devoted to the public use.

The defendant was chartered under the laws of the state of Delaware February 19, 1919, with the special object and purpose of acquiring from the Alien Property Custodian "patents, and applications therefor, trade-marks, choses in action, and rights and claims of every character and description, owing or belonging to or held for, by, on account of, or on behalf of, or for the benefit of, an enemy or ally of enemy, as defined by said act [the Trading with the Enemy Act] which the Alien Property Custodian is authorized by said act, and amendments thereto, to require and seize, and to sell and convey, * * * and to hold any such property and rights so acquired in a fiduciary capacity for the Americanization of such industries as may be affected thereby, for the exclusion or elimination of alien interests hostile or detrimental to the said industries, and for the advancement of chemical and allied science and industry in the United States." R. pp. 90, 91. In furtherance of those objects and purposes the charter provides that "the corporation may grant nonexclusive licenses only, to make, use, and sell the inventions covered by any patents owned or controlled by it to the United States of America, upon such terms as the board of directors may determine, and also upon reasonable and equal terms and without advantage, as between licensees, to the following: (1) Natural persons, citizens of the United States; (2) copartnerships, all the members of which are citizens of the United States; and (3) corporations organized under the laws of the United States or of any state, territory, or dependency of the United States, of which not less than three-fourths of the capital stock and the beneficial interest therein is owned by stockholders who are citizens of the United States, and who were not, prior to the 'end of the war,' as used in the 'Trading with the Enemy Act,' enemies or allies of enemies, as defined by said act, and the amendments thereto. The board of directors may refuse to issue any license or may revoke any license granted by the corporation and may prescribe the terms and conditions of said licenses." R. p. 91. The general powers are limited to those having "connection" with the special object of the corporation. The authorized capital stock is $500,000, divided into 4,000 shares of preferred stock, nonvoting save upon proposed amendments to the charter, and 1,000 shares of common stock. The preferred stock is entitled to cumulative dividends at the rate of 6 per cent. per annum and is subject to redemption at par and accumulated dividends. Dividends upon the common stock are noncumulative and are limited to 6 per cent. per annum. After the redemption of the preferred stock the net earnings of the corporation in excess of the amount necessary for working capital "shall be used and devoted to the development and advancement of chemistry and allied sciences, in the useful

arts and manufactures in the United States, in such manner as the board of directors may determine." R. p. 94.

As some citizens, either naturalized or native-born, might, if granted a license, use that license, not "for the advancement of chemical and allied science and industry in the United States," but to its detriment, it was obviously necessary to leave the power to refuse or revoke a license to the board of directors. It was equally important that that discretionary power, with which the board of directors was necessarily vested in order to prevent the subversion of the dominant purpose of the transfer of the property to the defendant, should not be exercised to restrict the use of that property to any less than the whole number of Americans who should desire in good faith to use that property for the advancement of science and industry in America. To this end, and to prevent the possibility that self-interest might obscure the broad public interest intended to be served, the persons then engaged in the chemical industry in America, who purchased the capital stock of the defendant, were permitted neither to act as directors nor to name the directors of the defendant. It was made a condition of the sale that the original directors and officers "should be of those who had been particularly and intimately associated with the work of investigating the German hold upon the chemical industry in America." R. p. 2631. The directors elected in accordance with this plan were Francis P. Garvan, Douglas I. McKay, and George J. Corbett, none of whom were financially interested in the chemical industry. But the term of office of an officer or director of the defendant—a Delaware corporation—is short. It was necessary to look beyond that term and provide for the safeguarding of the public interest throughout the life of the longest patent. Hence the stockholders of the defendant were required to transfer and deliver their shares of stock to trustees to be held by them until January 1, 1936. The trustees selected were likewise persons who had no private or selfish interest to serve and whose patriotism and loyal devotion to the public interest had also been tried under the stress and strain of the war. The persons designated as the trustees were Otto T. Bannard, George L. Ingraham, Cleveland H. Dodge, Benjamin H. Griswold, Jr., and Ralph Stone, who constituted by appointment of the President the Advisory Sales Committee of the Alien Property Custodian. The trustees were made self-perpetuating. The result was characterized by the President as a "wonderful accomplishment." Defendant's Exhibit No. 150, R. p. 3238; Ex. p. 2843.

The devotion of the property to the public use stands not upon written documents alone. It has a deeper foundation—the property is in the keeping of men who have in its management no selfish interest to serve and whose devotion to the public interest has been established. No better plan for devoting the property to the public use has been suggested. The plan has stood the most severe of all tests—actual trial. The defendant has kept the faith. This it has done, not only by granting licenses in furtherance of the purpose for which defendant was chartered, but also at its great expense by the distribution of books and pamphlets showing the national necessity for the practical

development of chemical science in America. If, perchance, those heretofore engaged in the chemical and allied industries have derived an incidental advantage from the plan, that incidental result cannot invalidate a transaction lawfully consummated in the public interest. The same charge would lie against the validity of every tariff act. Incidental results flowing from the accomplishment of his main purpose have been used, but ineffectively, to nullify the acts of the Secretary of War under the statute of March 3, 1899. Scranton v. Wheeler, 179 U. S. 141, 21 Sup. Ct. 48, 45 L. Ed. 126; Union Bridge Co. v. United States, 204 U. S. 364, 27 Sup. Ct. 367, 51 L. Ed. 523. The transaction in suit was not one granting a subsidy to a private industry. It was a devotion in the public interest of the property to a public use. The property is available for any American citizen, copartnership, or corporation that desires to use it for the advancement in the United States of the only science or industry to which, by reason of its nature, that property is applicable. The sale was in effect a sale to America and its citizens, not to persons then engaged in chemical and allied industries. But there is a further reason that prevents the upholding of this and other contentions of the plaintiff with respect to the terms and conditions of the sale.

[21] If the executive officers upon whom Congress conferred the power of disposal of enemy property acted within the scope of their powers, their acts are not subject to judicial nullification or review. Acts done within the field of power marked out by Congress are controlled only by the judgment and discretion of those to whom the power has been granted. The boundaries of that field are barriers for the officers and the courts alike. Beyond those boundaries the officers may not pass; within them the courts may not go. The invasion of that field by the courts to determine whether the public interest required that the property in suit should be sold otherwise than under the statutory conditions of sale prescribed for property of the ordinary and usual class and to set aside the sale, should the judgment of the courts be different from that of the President, would be a judicial nullification, not only of the act of the President, but also of the act of Congress conferring upon the President the power to determine what the public interest required. The power to dispose of the property in suit as though he were the absolute owner thereof having been granted to the Custodian, acting under the supervision and direction of the President, the courts may not nullify the sale because the terms and conditions thereof were otherwise than in the judgment of the court they should have been. Moreover, what the public interest requires depends upon the conditions existing in the nation. Courts do not know the "state of the Union," and, as I apprehend, are not equipped to ascertain it. Those to whose keeping the public interest, so far as it is intermixed with enemy property, has been confided by Congress, must be the sole judges of what the public interest requires.

In Dakota Cent. Tel. Co. v. South Dakota, 250 U. S. 163, 39 Sup. Ct. 507, 63 L. Ed. 910, 4 A. L. R. 1623, the right of the President to take over and control intrastate telephone lines in the exercise of

his power under the joint resolution of Congress of July 16, 1918 (Comp. St. Ann. Supp. 1919, § 3115¾x), was challenged. The court held, as stated in the syllabus, that "whether the exercise of the power so conferred was justified by the conditions at the time, or was actuated by proper motives, are questions of executive discretion not within the cognizance of the judiciary, under the Constitution." That "the judicial may not invade the legislative or executive departments so as to correct alleged mistakes or wrongs arising from asserted abuse of discretion" was reaffirmed. 250 U. S. 184, 39 Sup. Ct. 509 (63 L. Ed. 910, 4 A. L. R. 1623). In Martin v. Mott, 12 Wheat. 19, 30, 6 L. Ed. 537, the Supreme Court was asked to review the decision of the President, made under the Constitution and an act of Congress, that the situation in one of the states was such as to make it necessary to call out the militia. Mr. Justice Story, speaking for the court, said:

" * * * We are all of opinion that the authority to decide whether the exigency has arisen belongs exclusively to the President, and that his decision is conclusive upon all other persons. We think that this construction necessarily results from the nature of the power itself, and from the manifest object contemplated by the act of Congress. * * * Besides, in many instances, the evidence upon which the President might decide that there is imminent danger of invasion might be of a nature not constituting strict technical proof, or the disclosure of the evidence might reveal important secrets of state, which the public interest, and even safety, might imperiously demand to be kept in concealment. * * * .

"The law does not provide for any appeal from the judgment of the President, or for any right in subordinate officers to review his decision, and in effect defeat it. Whenever a statute gives a discretionary power to any person, to be exercised by him, upon his own opinion of certain facts, it is a sound rule of construction that the statute constitutes him the sole and exclusive judge of the existence of those facts. And in the present case we are all of opinion that such is the true construction of the act of 1795. It is no answer that such a power may be abused, for there is no power which is not susceptible of abuse. The remedy for this, as well as for all other official misconduct, if it should occur, is to be found in the Constitution itself. In a free government, the danger must be remote, since, in addition to the high qualities which the Executive must be presumed to possess, of public virtue and honest devotion to the public interests, the frequency of elections, and the watchfulness of the representatives of the nation, carry with them all the checks which can be useful to guard against usurpation or wanton tyranny."

That the same principles apply to an officer, other than the President, acting only under an act of Congress, is likewise settled. In Monongahela Bridge v. United States, 216 U. S. 177, 30 Sup. Ct. 356, 54 L. Ed. 435, the defendant, in a suit instituted by the United States to compel the making of alterations in a bridge determined by the Secretary of War to be an unreasonable obstruction to navigation, offered to prove that the bridge was not an unreasonable obstruction to naviga-

tion and that the changes in the bridge ordered by the Secretary of War were not necessary. The court (216 U. S. 195, 30 Sup. Ct. 361) said:

"It was not for the jury to weigh the evidence and determine, according to *their* [3] judgment, as to what the necessities of navigation required, or whether the bridge was an unreasonable obstruction. The jury might have differed from the Secretary. That was immaterial; for Congress intended by its legislation to give the same force and effect to the decision of the Secretary of War that would have been accorded to direct action by it on the subject. It is for Congress, under the Constitution, to regulate the right of navigation by all appropriate means, to declare what is necessary to be done in order to free navigation from obstruction, and to prescribe the way in which the question of obstruction shall be determined. Its action in the premises cannot be revised or ignored by the courts or by juries, except that when it provides for an investigation of the facts, upon notice and after hearing, before final action is taken, the courts can see to it that executive officers conform their action to the mode prescribed by Congress. Learned counsel for the defendant suggests some extreme cases, showing how reckless and arbitrary might be the action of executive officers proceeding under an act of Congress, the enforcement of which affects the enjoyment or value of private property. It will be time enough to deal with such cases as and when they arise."

[22] The requirement of the amendment of March, 1918, that the reasons in the public interest for the President's determination be stated does not, in my opinion, affect the pertinency of the principles of the cases cited to the case at bar. The statement of the reasons actuating the President does not make his act any the less an act of discretion. Moreover, the judicial power to determine whether the reasons assigned are supported by the facts extends to any and all reasons or to none. It is conceded that the President may not be brought into court to substantiate his reasons. The statute does not require him to disclose to the purchaser the evidence upon which his reasons were based. The statute does not limit the Executive in the assignment of reasons to such as may be supported by legal evidence or by facts available to the public. Obviously, if the validity of a sale of enemy property to a purchaser may be challenged at any time by the United States on the ground that the reasons assigned by the President in the public interest were not supported by the facts and the sale be set aside unless the purchaser succeeds in establishing by legal proof in a court of law that the President's reasons were supported by facts few, if any, purchasers could meet the burden. They would be wholly at the mercy of the seller, the United States. A sale of that character would be nothing more than a game of chance in which the result—the stability or validity of the sale—would always be within the control of the seller. A sales statute exposing such a solecism would be not only useless, it would be paradoxical.

[23] The bill of complaint charges that the seizure and sales of the property in suit were induced, brought about and accomplished by and through a combination, scheme, and conspiracy of certain representa-

[3] Italics in text.

tives of the chemical and dye industries. The charge is found in paragraph 22 of the bill. It is:

"That with the object and purpose of securing such control of said enemy-owned patents, copyrights, trade-marks, labels, and other similar rights and applications therefor, and for the purposes hereinbefore stated, said persons, firms, corporations, and trade associations and others associated with them in said industry and in the control and monopoly thereof conceived and entered into a scheme, combination, and conspiracy prior to or about November, 1918, to induce and procure the seizure of said enemy-owned patents, copyrights, trade-marks, labels, and other similar rights and applications therefor by the Alien Property Custodian, and the sale, transfer, and assignment thereof by said Alien Property Custodian to themselves or to some corporation, agency, or institution controlled by them."

At the opening of the trial the court announced that each party to the suit would be permitted, without regard to the usual rules of evidence, to take and put of record all evidence that, in the opinion of its counsel, would in any manner tend to prove or disprove any issue of the case. R. pp. 869–871, 2589. Notwithstanding the generality of the allegations and the unlimited opportunity afforded the plaintiff to support them by evidence, the charges of deception and conspiracy have failed utterly. The contrast between the allegations and the proof may be illustrated by that which was alleged concerning the two assignments made by the present Custodian and his testimony pertaining thereto. The bill of complaint, which was verified by the present Custodian, states (R. p. 54): "Complainant is informed, believes, and therefore avers that said instruments of alleged sale, assignment, and transfer were prepared by or at the instance and procurement of said defendant. * * *" His testimony was (R. pp. 2197–2198): "XQ. 414. Now, Colonel, I want to take up with you the two assignments to the Chemical Foundation that you signed. Those were drawn in your office, were they not? A. Why, certainly; any order that I sign is drawn in my office. XQ. 415. Well, those were drawn in your office, were they not? A. Yes, sir. XQ. 416. And they were drawn by your employees? A. Yes, sir."

Immediately following the above-quoted allegation the bill of complaint states (R. p. 54) that the Alien Property Custodian "executed said instruments without knowledge of the facts herein set forth and other necessary essential facts in relation to the alleged sale, assignment, and transfer of said patents and other rights; that said facts were withheld from him with intent and purpose to secure the execution by him of the instruments aforesaid, which he would not have executed had the true facts been known to him. * * *" The testimony of the Custodian was (R. p. 2200): "XQ. 434. What facts are there that you know now, or when you signed the bill of complaint, that you did not know when you signed the assignment? Now, have I made it plain? A. As your question, Mr. Kresel, concerns two different questions [assignments] by me, I must discuss in my answer the two assignments separately. XQ. 435. I wish you would. A. I would not have signed the second assignment of November 1 [5], 1921, had I known all of the information brought to me by my counsel, by

the Department of Justice, at the time the Chemical Foundation suit came up. I would sign the first transaction of April 27, 1921, over again, and I have got no apologies for it, and I criticize no one for bringing it to me. * * * XQ. 451. What were the facts which came to your knowledge before you verified the bill of complaint herein which, if you had known in November, 1921, you would not have signed this assignment of November, 1921? Do you understand my question? A. Yes, sir; why, the bringing of this suit, which was brought at the direction of the President, upset what we might term the friendly relations existing between my office and the Chemical Foundation. And I certainly would not have executed the November 5, 1921, assignment had I known that the Chemical Foundation sale was going— XQ. 452. The Chemical Foundation what? A. (continuing) That the Chemical Foundation sale was going to be questioned by the Department of Justice. * * * XQ. 455. You say in this paragraph that I have read to you that facts were withheld from you with intent and purpose to secure the execution by you of the aforesaid instrument. What facts were withheld and suppressed from you? A. I cannot enumerate any facts at this time, Mr. Kresel. * * * XQ. 457. * * * You say in your bill that facts were withheld and suppressed from you. Can you not state what facts were withheld or suppressed from you? A. I cannot state any more facts in answer to your questions than I already have."

In view of this testimony and the obvious fact that the power to charge persons with fraud and conspiracy is a weapon with which serious irremediable injury may be done to innocent persons if such charges are lightly made, it is difficult to understand why the specific charges to which the foregoing testimony relates were made. Yet the remaining like charges were equally lacking in evidential support. In fact, at the argument the plaintiff seemed no longer to press those charges against the persons alleged to be the conspirators, but it sought to have the charges sustained as against the officers of the government who formulated and carried out in the public interest the plan of sale of the property in suit. No authority is necessary to show that this may not be done. But if that were legally permissible it would not avail the plaintiff, for such charges, too, would be without evidential support. While I know of no case where by implication of law the duty of clearing itself from imputed fraud rests upon the defendant, yet the defendant has met even this burden. The testimony of Mr. Palmer, who was neither cross-examined nor contradicted, discloses the circumstances which gave rise to the plan, and that it was at his request that representatives of the industry to which the patents in suit appertain gave their aid and financial assistance in carrying it into execution. R. pp. 2598–2606. Mr. Garvan's testimony is to the same effect. R. pp. 2790, 2791. But the establishment of this fact is not left to depend upon memory. It is corroborated, if not independently established, by the documentary evidence of the plaintiff. Plaintiff's Exhibit No. 27, dated January 25, 1919; Ex. p. 84. Its allegations and evidence with respect to conspiracy and deception do not advance the plaintiff towards the goal for which it strives.

[24] The plaintiff contends that the assignments made by Mr. Garvan as Alien Property Custodian to the defendant are invalid for the further reason that at the time of making the assignments Mr. Garvan was its president. Prior to Mr. Palmer's resignation as Alien Property Custodian he caused the organization of the defendant "for the purpose of diverting these German chemical patents into general public use for the benefit of this country." The terms and conditions of sale had been agreed upon. To make certain that all the purposes for the consummation of which the defendant was organized would be carried out, not only in the letter but in the spirit in which they were conceived, Mr. Palmer made it a condition that the officers of the defendant should be persons named by him. Mr. Garvan, who had been particularly and intimately associated with the work of investigating the German hold upon the chemical industry in America, and in evolving the plan to be carried out through the instrumentality of the defendant, and who "was more familiar with this situation than anybody in the country," was selected by Mr. Palmer to be the president of the defendant. Mr. Garvan agreed to accept. Mr. Palmer was then appointed Attorney General of the United States. Late in the afternoon of March 3, 1919, he called upon the President of the United States to present his resignation as Alien Property Custodian and to urge the immediate appointment of his successor. The sale of the property to the defendant was discussed. The President was told the facts above narrated. R. p. 2625–2636. Mr. Palmer stated to the President that he considered the actual consummation of the Americanization of the German chemical patents was the most important constructive work that "we had on hand." Mr. Palmer urged Mr. Garvan's appointment as Custodian, and said "* * * that my purpose in urging Mr. Garvan's appointment as Alien Property Custodian was quite largely in view of the fact that he had undertaken to be the president of this corporation, and I knew he could be absolutely trusted to carry out its plans and purposes to the letter and in their full spirit. I would not have felt so safe in putting this plan over, if I had not been able to pick out from my organization men of that kind who could and would operate it not only as we wanted it to be run, but with a patriotic desire to serve their country." R. p. 2632. Mr. Palmer had with him the commission in blank as Alien Property Custodian, and after Mr. Palmer's statement the President took the commission and wrote in the name of Francis P. Garvan. Mr. Palmer delivered it to Mr. Garvan that evening. Mr. Garvan took the oath of office the next day. He became president of the defendant on March 8th. With the exception of the two assignments executed by the present Custodian all the assignments to the defendant were executed by Mr. Garvan as Custodian.

Plaintiff's present contention rests upon section 41 of the Criminal Code of the United States, which provides: "No officer or agent of any corporation, joint-stock company, or association, and no member or agent of any firm, or person directly or indirectly interested in the pecuniary profits or contracts of such corporation, joint-stock company, association, or firm, shall be employed or shall act as an officer or agent of the United States for the transaction of business with such corporation, joint-stock company, association, or firm. Whoever shall violate

the provision of this section shall be fined not more than two thousand dollars and imprisoned not more than two years." 35 Stat. 1097 (Comp. St. § 10205). The first paragraph of section 7 (e) of the Trading with the Enemy Act (Comp. St. 1918, Comp. St. Ann. Supp. 1919, § 3115½d) provides, however, that "no person shall be held liable in any court for or in respect to anything done or omitted in pursuance of any order, rule, or regulation made by the President under the authority of this act." If, as was held in Miller v. United States, 11 Wall. 268, 20 L. Ed. 135, statutes with respect to enemy property are "not enacted under the municipal power of Congress to legislate for the punishment of crimes against the sovereignty of the United States," but, on the contrary, "are an exercise of the war powers of the government" and "are not affected by the restrictions imposed by the Fifth and Sixth Amendments" to the Constitution, it is equally clear that with respect to enemy property Congress may, if it chooses, free the President and those "acting under his supervision and direction" from the restraint of statutes passed when only the normal affairs of the nation are in contemplation. That Congress did elect so to do with respect to enemy property in America during the late war is, I think, placed beyond controversy by the clear, broad and general language of section 7 (e) of the Trading with the Enemy Act. As said by the German Consul General, America was "unquestionably face to face with conditions * * * without a parallel in the past."

Congress met those conditions, in part, by the passage of the Trading with the Enemy Act. Thereby almost unlimited power with respect to enemy property was conferred upon the President. None of that property could be disposed of save under his supervision and direction. In the public interest he could make such disposition thereof as he deemed proper and the nature of the property permitted. By the Trading with the Enemy Act Congress made him commander in chief of the civil officers having to do with enemy property almost if not quite as completely and effectively as the Constitution made him Commander in Chief of the Army and Navy. It did more. It made the Trading with the Enemy Act and the orders of the President thereunder the supreme law with respect to enemy property. It validated every act done by a subordinate officer in obedience to such orders of the President. See Martin v. Mott, 12 Wheat. 19, 29–32, 6 L. Ed. 537. The Custodian, who was not barred by section 41 of the Criminal Code or otherwise from being also an officer of the defendant, was subject to the orders and direction of the President. All acts done by the Custodian touching the property in suit were done "under the supervision and direction of the President." By reason of section 7 (e) of the Trading with the Enemy Act, section 41 of the Criminal Code is without relevancy to acts so done, and hence without relevancy to the issues of this suit.

During the trial of 33 days, in the closing argument consuming 5 full days and in the briefs containing approximately 2,000 pages, some other questions with respect to the validity of the sale were raised, but none, I think, after examining them, that call for further consideration, or make it necessary to extend an opinion whose present length is justified only by the great mass of testimony and exhibits and the

earnestness and thoroughness with which the many questions presented were debated by the counsel for the respective parties.

In view of the conclusions hereinbefore arrived at, the incidental motions of the parties become moot and are denied.

Finding no ground upon which the sale of enemy property to the defendant may be set aside, the bill of complaint must be dismissed.